RICARDO DOMÍNGUEZ TALAVERA, demandante y peticionario, *v.* CAGUAS EXPRESSWAY MOTORS, INC.; VELCO, INC. y FORD MOTOR CO. CARIBBEAN INC., demandados y recurridos.

*Número:* CC-97-444          *Resuelto*: 24 de mayo de 1999

*F. Ariel Avilés Rodríguez*, abogado de la parte peticionaria; *Agustín Mangual Hernández*, abogado de Caguas Expres-

sway Motors Inc., recurrida; *Luz Irradia González Turull*, abogada de Ford Motor Company Caribbean, Inc., recurrida.

PER CURIAM: El Sr. Ricardo Domínguez Talavera nos solicita que revisemos una sentencia emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional I de San Juan, mediante la cual se revocó una decisión del Departamento de Asuntos del Consumidor que había ordenado la resolución de un contrato de compraventa de un vehículo de motor llevado a cabo por las partes del caso de epígrafe. Procede revocar la sentencia emitida por el Tribunal de Circuito de Apelaciones y confirmar la Resolución del Departamento de Asuntos del Consumidor.

## I

Según los documentos que forman parte del expediente de este caso, el 8 de agosto de 1993, Vehicle Equipment Company, Inc. (V.E.L.Co.), compró a Caguas Expressway Motors, Inc. (Caguas Expressway) un vehículo nuevo marca Ford, modelo Club Wagon de 1993, por el precio de treinta y dos mil dólares ($32,000). El mismo día, V.E.L.Co. arrendó dicho vehículo al Sr. Ricardo Domínguez Talavera, mediante un contrato de arrendamiento financiero abierto (*open end*). En conformidad con la cláusula Núm. 14 de dicho contrato, V.E.L.Co. cedió al arrendatario el derecho de reclamación frente al fabricante, bajo las disposiciones del contrato de garantía.[1]

Antes de la entrega del vehículo al señor Domínguez Talavera, Caguas Expressway realizó labores en el vehículo para corregir defectos en el control de velocidad cons-

---

[1] La cláusula Núm. 14 establece:

"Lessor shall permit Lessee to enforce in Lessee's own name any and all warranties made by the manufacturer of each Unit, but Lessor assumes no responsibility for compliance therefor by the manufacturer." Petición de *certiorari*, Apéndice, Anejo 6, pág. 134.

tante (*cruise control*) y reparar la manga de aire del asiento con apoyo lumbar (*lumbar seat*). También reemplazó la rueda del guía. Corregidos estos defectos, se le entregó el vehículo nuevo a Domínguez Talavera. Durante el siguiente mes Domínguez Talavera tuvo que llevar el vehículo a Caguas Expressway en dos (2) ocasiones para que repararan una serie de defectos.([2])

Al persistir los defectos, Domínguez Talavera presentó una querella ante el Departamento de Asuntos del Consumidor (D.A.Co.) contra Caguas Expressway, Ford Motor Company y V.E.L.Co., y solicitó como remedio el cambio del vehículo por otro nuevo o la resolución del contrato.

A raíz de la querella presentada, el Sr. Julio Morales, técnico de D.A.Co., inspeccionó el vehículo junto al Sr. Néstor Torres, de Caguas Expressway, y el señor Domínguez Talavera. Durante la inspección, Domínguez Talavera "manifestó" que a él no le interesaba el vehículo y que solicitaba el cambio de la unidad.

Como Caguas Expressway no estuvo de acuerdo con cambiar la unidad, D.A.Co. celebró una vista administrativa para dilucidar la querella. Durante dicha vista, Domínguez Talavera y Caguas Expressway llegaron a un acuerdo según el cual esta última corregiría todos los pro-

---

([2]) Según surge de las determinaciones de hecho en la resolución del Departamento de Asuntos del Consumidor (D.A.Co.), el 17 de agosto de 1993 —ocho (8) días después de que se le entregara el vehículo— el señor Domínguez Talavera lo llevó a Caguas Expressway para la corrección de los siguientes: (a) acondicionador de aire no enfría; (b) ambos parachoques (*bumpers*) y asiento trasero tienen moho; (c) ruido en tren delantero, aparentemente *calipper*; (d) fallo en el motor; (e) control de velocidad constante (*cruise control*) no funciona ocasionalmente; (f) enciende algo por debajo de la unidad. El vehículo le fue devuelto al señor Domínguez Talavera, luego de ser evaluado y reparado. Sin embargo, el 31 de agosto de 1993 el señor Domínguez tuvo que llevar el vehículo nuevamente a Caguas Expressway para la corrección de los defectos siguientes: (a) control de velocidad constante (*cruise control*) no funciona; (b) ruido en el tren delantero; (c) fallo de motor y gasta mucha gasolina; (d) ruido en lado izquierdo del *dash* (cuando pasa por carretera irregular); (e) acondicionador de aire no enfría; (f) ambos parachoques (*bumpers*) están mohosos; (g) espejos retrovisores no funcionan adecuadamente; (h) ruido por debajo, como si se activara algo; (i) ruido al subir y bajar el cristal del lado del conductor; (j) al encenderlo por la mañana presenta un fallo; (k) bonete descuadrado; (l) vibración a alta velocidad; (m) motor trabaja caliente; (n) ruido que aparenta ser de correas o en el *clutch* frío.

blemas del vehículo que habían sido señalados.(³) Además, D.A.Co. inspeccionaría el vehículo antes de devolvérselo.

La reparación del vehículo tomó alrededor de treinta (30) días. Concluida la misma, el técnico de D.A.Co. inspeccionó el vehículo y determinó que subsistían los defectos mecánicos siguientes: (1) problemas en los frenos delanteros; (2) ruido en la puerta del conductor al subir y bajar el cristal, y (3) goteo de aceite por la tuerca de la manga de presión del sistema auxiliar del volante (*power steering*). Se acordó que el técnico de D.A.Co. verificaría la reparación de estos tres (3) problemas antes de entregarle el vehículo al querellante.

Un (1) mes después de dicha inspección el técnico de D.A.Co. revisó nuevamente el vehículo y encontró una filtración de aceite en el sistema auxiliar del volante (*power steering*). En el informe, el inspector de D.A.Co. señaló que los frenos funcionaban correctamente, pero que Domínguez Talavera insistía que estaban vibrando.(⁴) En esta ocasión

---

(³) La lista completa de los defectos señalados por el querellante y que, a raíz de la vista, Caguas Expressway se comprometió a corregir es la siguiente: (a) óxido en los parachoques (*bumpers*); (b) cuero del guía está roto; (c) ruido en el cristal del lado del conductor; (d) control del asiento del lado del conductor (que es eléctrico) está defectuoso; (e) vibración cuando va a alta velocidad; (f) ruido y *lift* en el sistema auxiliar del volante (*power steering*); (g) ruido y filtración de aceite de la unidad auxiliar del volante (*power steering*); (h) espejos retrovisores no funcionan adecuadamente; (i) filtración de aceite del acondicionador de aire, la unidad delantera sólo funciona en velocidad máxima (*high*) y presenta mal olor; (j) bomba de gasolina se activa sola (aunque el vehículo esté apagado); (k) vibración en el sistema de frenos cuando el vehículo está detenido (fuerte ruido en la parte delantera); (l) motor se calienta (trabaja muy caliente, gasta mucha gasolina y quema combustible crudo ya que expide humo negro por el tubo de escape (*muffler*)); (m) problema de encendido por la mañana (luego que se calienta se estabiliza); (n) correa delantera del sistema del motor suena mucho por las mañanas (si pasa por "baches" en la carretera la correa comienza a patinar, y el guía se pone pesado y difícil de manejar); (o) el seguro automático (que es eléctrico) de la puerta de cargo se siente como si el sistema estuviese suelto (puerta lateral derecha); (p) ruido en la transmisión cuando frena (da un golpe y al arrancar produce nuevamente el golpe); (q) alineación está fuera de las especificaciones; (r) *power point* localizado detrás del asiento del conductor no funciona; (s) armazón de metal del asiento trasero está oxidado; (t) sistema de control de velocidad constante (*cruise control*) funciona en ocasiones; (u) ruido en el panel de instrumentos (*dash*) (como si fuera un pajarito); (v) descuadre del bonete delantero.

(⁴) El señor Domínguez Talavera era quien iba conduciendo.

él rehusó dejar el vehículo en Caguas Expressway y se lo llevó.

Así las cosas, el querellante solicitó la celebración de otra vista administrativa en torno a su querella. Surge de la Resolución de D.A.Co. que en la vista testificaron el Sr. Julio Morales, técnico automotriz de D.A.Co., y el Sr. Mario Burgos, perito del querellante, entre varios otros testigos.

Concluida la vista, D.A.Co. emitió una resolución mediante la cual determinó que Caguas Expressway y Ford Motor Company debían reembolsar solidariamente a Domínguez Talavera todas las mensualidades que éste pagó a V.E.L.Co. en concepto del canon de arrendamiento financiero. Además, ordenó que las compañías relevaran a Domínguez Talavera del remanente de la deuda en concepto del contrato de arrendamiento financiero que ascendía a la suma de cinco mil setecientos noventa y seis dólares ($5,796).

Ambas compañías presentaron unas mociones de reconsideración que fueron denegadas. Caguas Expressway y Ford Motor Company presentaron recursos de revisión en el entonces Tribunal Superior, Sala de San Juan, los cuales fueron remitidos posteriormente al Tribunal de Circuito de Apelaciones en conformidad con el Art. 9.004 de la Ley de la Judicatura de 1994, según enmendada por la Ley Núm. 248 de 25 de diciembre de 1995 (4 L.P.R.A. sec. 23f).

El Tribunal de Circuito de Apelaciones, después de ordenar la consolidación de ambos recursos de revisión, dictó la sentencia que es objeto del presente recurso. Determinó, en lo esencial, que el dictamen de D.A.Co. "no encuentra apoyo ni está sostenido por la evidencia sustancial obrante en el expediente administrativo, y resulta contrario a derecho". Anejo 2(b), pág. 30. Por lo tanto, concluyó el tribunal que "la decisión recurrida no puede prevalecer". Íd.

Inconforme, Domínguez Talavera acude ante nos mediante *certiorari*. Examinada la petición, le concedimos a

las empresas recurridas un término para que comparecieran y mostraran causa por la cual no debíamos revocar la sentencia que dictó el Tribunal de Circuito de Apelaciones. Habiendo comparecido las dos (2) empresas, resolvemos según lo intimado sin procedimientos ulteriores.

## II

En síntesis, el querellante peticionario plantea que: (1) el Tribunal de Circuito de Apelaciones intervino con las determinaciones de hecho del foro administrativo especializado, sustituyendo arbitrariamente la apreciación de dicho organismo por sus apreciaciones particulares, y (2) el tribunal tampoco concedió deferencia a las conclusiones de derecho de D.A.Co. al concluir que no existían los vicios ocultos que justificaran la resolución del contrato. Ambas cuestiones están íntimamente relacionadas. Veamos.

D.A.Co. fue creado con el propósito primordial de vindicar e implementar los derechos del consumidor. Art. 3 de la Ley Núm. 5 de 23 de abril de 1973, conocida como Ley Orgánica del Departamento de Asuntos del Consumidor, 3 L.P.R.A. sec. 341b. El Secretario de D.A.Co. tiene el poder de investigar y resolver las querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía. Art. 6(c) de la Ley Núm. 5, *supra*, 3 L.P.R.A. sec. 341e(c). Posteriormente se aprobó la Ley Núm. 7 de 24 de septiembre de 1979, conocida como Ley de Garantías de Vehículos de Motor, 10 L.P.R.A. sec. 2051 *et seq.*, con el propósito de "velar por que los intereses de los consumidores sean salvaguardados frente a los intereses del manufacturero y el distribuidor o vendedor ...". Art. 3 de la Ley Núm. 7, *supra*, 10 L.P.R.A. sec. 2053. Esta ley, en su Art. 13 (10 L.P.R.A. sec. 2063), faculta a D.A.Co. para adoptar reglamentos para implantar los propósitos de dicha ley. El Art. 26.3 del Reglamento

de Garantías de Vehículo de Motor [5] creado en virtud de esta facultad, establece lo siguiente:

26.3  OPORTUNIDAD RAZONABLE PARA REPARAR DE-FECTOS-

El Departamento podrá a opción del consumidor, decretar la resolución del contrato o reducir proporcionalmente su precio de venta de acuerdo a las disposiciones del Código Civil de Puerto Rico en aquellos casos en que el vendedor o su representante, dentro de los términos de la garantía, tuvo oportunidad razonable para reparar uno o más defectos, pero no quiso o no pudo corregirlos. *Lo que constituye oportunidad razonable de reparar se determinará tomando en consideración las circunstancias particulares de cada caso.* (Énfasis suplido.)

■  El Art. 34 hace referencia igualmente a las disposiciones del Código Civil:

Nada de lo dispuesto en este Reglamento limitará en forma alguna el derecho del consumidor a ejercer cualquier acción que le reconozcan las leyes generales o especiales del Estado Libre Asociado de Puerto Rico, así como las acciones de saneamiento por evicción, saneamiento por vicios ocultos y la acción redhibitoria que reconoce el Código Civil de Puerto Rico. Reglamento de Garantías de Vehículos de Motor Núm. 4797, Departamento de Asuntos del Consumimdor, aprobado el 28 de septiembre de 1992.

Como expresó correctamente el Tribunal de Circuito de Apelaciones, las determinaciones de D.A.Co. al actuar sobre estas cuestiones deben estar en armonía con las disposiciones pertinentes del Código Civil y de la jurisprudencia interpretativa de las mismas.

■  Todo vendedor de un bien mueble o inmueble está obligado a la entrega y al saneamiento de la cosa objeto de la venta. Art. 1350 del Código Civil, 31 L.P.R.A. sec. 3801. Por lo que el vendedor no cumple sólo con entregar la cosa objeto del contrato, sino que también tiene que garantizar

---

[5] Reglamento de Garantías de Vehículos de Motor Núm. 4797, Departamento de Asuntos del Consumidor, aprobado el 28 de septiembre 1992, que derogó el Reglamento Núm. 1560 que había sido aprobado el 23 de mayo de 1972.

al comprador la posesión pacífica y útil de ella. Este deber de garantía es conocido en el derecho de contratos con el nombre de "saneamiento por evicción" (perturbación jurídica del derecho dominical adquirido) y saneamiento por vicios ocultos (perturbación económica de la posesión de la cosa).[6] Ambas facetas del saneamiento están consignadas expresamente en el Art. 1373 del Código Civil, 31 L.P.R.A. sec. 3831.

■ El saneamiento por vicios ocultos o la redhibición es aquella situación que se produce cuando, después de verificada la entrega, se observa en la cosa vendida vicios ocultos que la hacen impropia para los usos a que se destina o disminuyen de tal modo su utilidad que el comprador, de haberlos conocido, no la hubiese adquirido o habría dado menos precio por ella.

■ Para que proceda la acción *redhibitoria* son necesarias las circunstancias siguientes: (a) que la cosa adolezca de un vicio; (b) que este vicio sea grave: que el vicio haga a la cosa impropia para el uso a que se la destina, o que disminuya de tal modo su utilidad que, de haberlo conocido el comprador, no la hubiese adquirido o hubiese dado menos precio por ella; (c) que sea oculto; (d) que sea preexistente a la venta; (e) que se ejercite la acción en el plazo legal, que es de seis (6) meses contados desde la entrega de la cosa vendida.

■ En resumen, si una vez verificada la entrega se demuestra el incumplimiento por parte del vendedor de garantizar la plena posesión económica de la cosa vendida, el comprador tiene a su favor una pretensión de redhibición.[7]

---

[6] Véase F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed. rev., Madrid, Eds. Pirámide, 1976, Vol. III, pág. 476 y ss.

[7] F. Puig Peña, *op. cit.*, pág. 489. Véanse: E. Vázquez Bote, *Tratado teórico práctico y crítico de derecho privado puertorriqueño*, Ed. Equity, 1992, Vol. I, pág. 174 y ss.; J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. III, Vol. II, pág. 193 y ss.

■ Hemos resuelto anteriormente que no son vicios redhibitorios o cuantiminosos aquellos defectos que no exceden de la medida de las imperfecciones menores que cabe esperar normalmente en un producto determinado. Asimismo hemos resuelto que no se requiere que el defecto imposibilite el uso de la cosa; basta con que merme notablemente su valor. *D.A.C.O. v. Marcelino Mercury, Inc.*, 105 D.P.R. 80 (1976).

■ A los fines de resolver la procedencia de la acción redhibitoria, hemos adoptado igualmente el criterio de que la apreciación de la importancia de los defectos es esencialmente una *cuestión de hecho*, por lo que el foro de instancia está en mejor posición para hacer esta apreciación que los foros apelativos. Por lo tanto, se justifica nuestra intervención con la discreción del juzgador sólo en aquellos casos en que se demuestre ausencia de prueba adecuada o error manifiesto en su apreciación. *García Viera v. Ciudad Chevrolet, Inc.*, 110 D.P.R. 158 (1980); *D.A.C.O. v. Marcelino Mercury, Inc.*, supra.

■ Similar criterio es el que rige la revisión de una resolución administrativa. Reiteradamente hemos resuelto que las decisiones de los organismos administrativos merecen la mayor deferencia judicial. Los tribunales no deben intervenir con las determinaciones de hecho de un organismo administrativo si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Metropolitana S.E. v. A.R.Pᴇ.*, 138 D.P.R. 200 (1995); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993). Esta norma de origen jurisprudencial ha sido acogida estatutariamente en la Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175.

■ Hemos reiterado que

[p]ara que un tribunal pueda decidir que la evidencia en el

expediente administrativo no es sustancial es necesario que la parte afectada demuestre que existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la prueba presentada y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración. *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 686 (1953). (Énfasis suplido.) *Metropolitana S.E. v. A.R.Pe.*, supra, pág. 213. Véase, además, *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998).

Si en la solicitud de revisión la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hecho de la agencia deben ser sostenidas por el tribunal revisor. *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999).

## III

Teniendo en cuenta los principios reseñados, debemos determinar si Caguas Expressway y Ford Motor Company presentaron la prueba requerida por nuestro ordenamiento administrativo para menoscabar el valor probatorio de la evidencia en que se fundamentaron las determinaciones de hecho de la agencia.

Le correspondía a Caguas Expressway y a Ford Motor Company demostrar que existía otra prueba en el récord administrativo que reducía o menoscababa el valor probatorio de la prueba en la cual se fundamentaron las determinaciones de hecho de la agencia. Sin embargo, en el caso de autos, Caguas Expressway y Ford Motor Company se limitaron a señalar que los informes del técnico de D.A.Co., Sr. Julio Morales, de 26 de mayo de 1994 y de 21 de junio de 1994 demostraban que a juicio de éste subsistía tan sólo un defecto en el vehículo al momento de su última inspección. Acompañaron, para fundamentar su alegación, copia de los informes que había preparado este técnico. Ba-

sándose en estos informes, el Tribunal de Circuito de Apelaciones determinó que no existían vicios redhibitorios en el automóvil del señor Domínguez Talavera en el momento en que D.A.Co. emitió su resolución. Erró.

Tras analizar detenidamente los informes del técnico de D.A.Co. y la resolución objeto de revisión, determinamos que estos informes evidentemente no menoscaban el valor probatorio de la prueba creída por D.A.Co. y a base de las cuales hizo sus determinaciones de hecho. De la propia resolución de D.A.Co. surge que este técnico, al testificar en las vistas, admitió no haber conducido el vehículo, por lo que no podía detectar si los frenos funcionaban adecuadamente.

Así mismo, surgen de la resolución al menos dos (2) inspecciones adicionales del vehículo. Una de estas inspecciones realizada por "personal especializado" reveló que el vehículo tenía un problema de desalineación tan grave que desgastaba excesivamente los neumáticos. Otro técnico automotriz, el Sr. Mario Burgos, también inspeccionó el vehículo el 15 de noviembre de 1994. Este técnico llevó a cabo una inspección visual del vehículo, además de conducirlo en una prueba de carretera. Éste detalló al menos seis (6) defectos[8] que subsistían en el vehículo luego de cuatro (4) intentos de reparación y más de sesenta (60) días en los talleres de Caguas Expressway. Observamos que esta inspección se llevó a cabo en una fecha posterior a la última vez que el técnico de D.A.Co., Sr. Julio Morales, inspeccionó el vehículo.

---

[8] Los defectos que encontró el técnico automotriz, Sr. Mario Burgos, son: (a) sistema de control de velocidad constante (*cruise control*) no funciona; (b) filtración hidráulica en la unidad auxiliar del volante (*power steering*); (c) falta aislador de la parte baja (inferior) del motor, la cual permite que salpique agua de la carretera a la correa y la misma patine; (d) inestable en frenadas a alta velocidad; (e) frenado no es totalmente efectivo al cabo de operar el vehículo por un tiempo prolongado luego de estar en tránsito congestionado; (f) diámetro de los pernos (tornillos) de la base de los *calippers* no son cónsonos con el diámetro de los orificios donde se alojan (el claro o *clearance* entre uno y otro excede en tamaño), lo cual causa fuete ruido en la parte baja del vehículo en pavimento irregular. Esta condición constituye un peligro evidente para los ocupantes del vehículo ya que eventualmente podría producir que el vehículo se quede sin frenos.

Al finalizar el proceso de vistas,[9] D.A.Co. concluyó que subsistían al menos siete (7) defectos [10] que Caguas Expressway había intentado reparar sin éxito. D.A.Co. apreció que estos defectos eran de carácter redhibitorio.

Caguas Expressway y Ford Motor Company no señalaron evidencia alguna obrante en el expediente administrativo que tuviese el efecto de menoscabar esta prueba. Los informes de un técnico, que ni siquiera condujo el vehículo y que no fue el último en inspeccionarlo, no constituye la prueba requerida en este caso para activar la intervención judicial. Por lo tanto, erró el Tribunal de Circuito de Apelaciones al revocar la resolución de D.A.Co. Procede revocar su sentencia y confirmar la resolución de D.A.Co.

*Se dictará la sentencia correspondiente.*

---

[9] Surge de los documentos suministrados por las partes que D.A.Co. llevó a cabo por lo menos tres (3) vistas.

[10] Los defectos que subsisten según D.A.Co. son: (a) filtración de aceite de *power steering*; (b) *cruise control* no funciona; (c) frenado deficiente, ruido en los *calippers*; (d) se activa algo en el área de la bomba de gasolina (aunque el vehículo esté apagado); (e) persiste mal olor de acondicionador de aire; (f) correas patinan cuando el vehículo pasa por un charco de agua en la carretera; (g) mecanismo de *power door lock* defectuoso (como si estuviera suelto).