*199 TEXTO COMPLETO DE LA SENTENCIA
Comparece el recurrente José L. Padín Medina, y nos solicita que revisemos y revoquemos una resolución de la Junta de Síndicos (en adelante también la Junta) de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (en adelante Retiro), dictada el 26 de octubre de 2004, archivada en autos y notificada a las partes el 24 de diciembre de ese mismo año, mediante la cual se confirmó la denegatoria de Retiro a una solicitud del recurrente para que se le concedieran los beneficios de una anualidad por incapacidad ocupacional o no ocupacional.
I
Hechos e Incidentes Pertinentes
El recurrente, de cincuenta años de edad, trabajó como miembro de la Policía de Puerto Rico cotizando al sistema de Retiro por unos 19.5 años.
Durante su desempeño como Policía sufrió dos accidentes relacionados en el trabajo.
El primer accidente ocurrió en 1985, cuando al tratar de arrestar a una persona, ésta resistió el arresto y lo agredió con los puños, cayendo al pavimento. En consecuencia, sufrió contusiones en el hombro izquierdo y otras partes del cuerpo. El Fondo del Seguro del Estado (en adelante el Fondo) le diagnosticó “síndrome doloroso del hombro izquierdo postraumático” y le fijó una incapacidad de un 20 por ciento de sus funciones fisiológicas en el brazo izquierdo, dándolo de alta.
El segundo accidente lo tuvo en 1993, cuando fue agredido en su residencia mientras intentaba arrestar a una persona por el delito de alteración a la paz. Sufrió contusiones en la boca y diferentes partes del cuerpo. El Fondo le diagnosticó “condición de esguince lumbar,” le fijó una incapacidad de un 15 por ciento de sus funciones fisiológicas generales y le dio de alta en marzo de 1995.
El primero de diciembre de 1997, el recurrente fue notificado por el Superintendente de la Policía de Puerto Rico que le cesanteaba de su puesto por incapacidad mental.
Al desarrollar una condición de depresión mayor, severa y recurrente, con diagnósticos no relacionados, el recurrente solicitó el 28 de agosto de 1998 que Retiro le concediera los beneficios de una incapacidad ocupacional o no ocupacional.
El 8 de julio de 1999, Retiro le denegó la anualidad por incapacidad solicitada. Fundamentó su denegatoria en lo siguiente:

“De los informes médicos que constan en nuestro poder relativos a su condición física, se ha determinado que aún está física y mentalmente capacitado (a) para desempeñar labores en el servicio público.

Otras razones: Las condiciones no relacionadas por el Fondo del Seguro del Estado también fueron evaluadas. No obstante, médicamente se determinó que las mismas no son incapacitantes.”

El 13 de agosto de 1999, el recurrente solicitó a Retiro reconsideración de dicha determinación. El 7 de mayo de 2000, Retiro declaró sin lugar la reconsideración solicitada y se reafirmó en su dictamen original.
*200 Oportunamente, el recurrente apeló de la decisión de Retiro ante la Junta de Síndicos, la que mediante resolución del 19 de abril de 2001 devolvió el caso a Retiro para que hiciera una revisión completa del mismo, con nueva evidencia a ser sometida por el recurrente.
Mediante resolución del 31 de enero de 2002, Retiro denegó nuevamente al recurrente los beneficios solicitados de una anualidad por incapacidad ocupacional o no ocupacional. El 27 de febrero siguiente, el recurrente presentó escrito de apelación ante la Junta de Síndicos.
El 6 de mayo de 2004 se celebró la correspondiente vista administrativa en la Junta de Síndicos. El 26 de octubre de 2004, la Junta emitió resolución confirmando la denegatoria de Retiro de conceder los beneficios solicitados por recurrente.
De lo sometido a nuestra consideración del expediente administrativo, surge que la Junta de Síndicos tomó en cuenta la siguiente evidencia médica relacionada con el caso del recurrente, según se consigna en la resolución de la cual se recurre:

“23. Al momento de la vista en su fondo en los autos de este caso, obraba la siguiente evidencia sobre pruebas efectuadas al apelante:

a. CT Scan-2 de junio de 1993- Área anatómica lumbar que sugiere lo siguiente: “Impression: Study compatible with bulging annullus fibrosus with small left posterior disc protussion with mild compression of the dural sac at L4-L5. There is also bulging annulus fribrosus with small central disc protussion and mild compression of the dural sac at L5-S1.”

b. EMG-23 de marzo de 1994- “impression: Normal electromiographic study of lower extremities.”

c. MRI of the lumbo sacral spine- 13 de febrero de 1991- “Impression- Denegenerative L4-L5 disc disease. Suggested disc bulges at the L3-L4,14-L5 and L5-S1 interspaces.”

24. El apelante fue evaluado por varios especialistas. De éstos se destaca la siguiente:

a. Dr. Héctor R. Stella- 6 de diciembre de 1993- el examen motor y sensorial adecuado. Los reflejos patelar y aquiliano ausente. Su impresión diagnóstica es de “Sprain” lumbo sacral, HNP L5-S1 bulging L4-L5y L5-S1.”

b. Dra. Evelyn Rodríguez Aja-Neuróloga- 1 de junio de 1999- Entró solo a la oficina con una marcha muy ágil. No cojeaba ni presentaba desbalance. Se sentaba, ponía de pie, subía y bajaba de camilla muy ágilmente. No usaba objeto de apoyo. No disaltria. Estaba alerta orientado en persona, lugar y tiempo. Buena memoria pasada, reciente e inmediata. Afecto adecuado. Estaba coherente, relevante, lógico. Buena atención, cooperador y espontáneo. Fue el informante de la enfermedad actual. Tono normal, no atrofia, la fuerza muscular era 5/5 en todo el cuerpo, no movimientos involuntarios, los reflejos profundos tendinosos positivo 1 todos, excepto ambos quilianos que fueron cero. No signos corticoespinales, lassegne, negativo bilateral sentado. Se paró en talón y puntillas ágilmente. No espasmos, hinchazón, cambios tróficos deformidad o contractura. Tinnel, Phalen y Adsson negativo. Hizo movimientos alternantes repetitivos rápidos con las cuatro extremidades muy ágilmente. Puede cargar, halar, empujar, agarrar objetos pesados. Hizo pinzas, puños, oposición. Puede viajar, estar en altura, guiar inclinarse. Entiende y recuerda instrucciones. Pudo golpear con la punta de los dedos, sostener una pluma y escribir, agarrar una moneda, abrir y cerrar una pluma normalmente. Diagnostico: Esguince lumbar, Enfermedad degenerativa de discos L4-L5m “Post Status of Trauma” en rodilla derecha. Pronóstico Bueno (Good’).

*201
25. Dr. Rafael Díaz Montaño y Dr. José R. Cuebas Vázquez, Asesores Médicos, evaluaron las condiciones orgánicas el 14 de junio y 28 de diciembre de 1999, respectivamente, llegando ambos a la conclusión de que dichas condiciones no llenan ni igualan el listado de severidad 1.05C1 y 2, ni ningún otro.

26. Al momento de la celebración de la vista en su fondo, en los autos de este caso obraba la siguiente prueba documental sobre la condición emocional:

a. Dr. Juan A. Guillén-Psiquiatra- Informe de 2 de junio de 1986- Actividad motora adecuada con retardación psicomotora, no tics. Su actitud fue alerta, cooperadora, espontánea, amigable, no hostil. Con una atención adecuada. Tuvo contacto visual. Se observó durante la entrevista tenso y en el borde del sillón. Sus asociaciones de ideas eran lógicas, coherentes, relevantes y en constante con la realidad. Presentó quejas somáticas y emocionales. No ideas suicidas ni homicidas. No presentó alucinaciones, no ilusiones ni despersonalización durante la entrevista. Su afecto fue apropiado al contenido - del pensamiento. Estaba orientado en persona, lugar y tiempo. Memoria para eventos recientes, remotos e inmediatos fue adecuada. Juicio e introspección adecuada. Diagnóstico; Desorden de Ansiedad Severo.

b. Dr. Juan A. Guillén-Psiquiatra-1 de mayo de 1996- Indica que trató a este apelante desde el 2 de junio de 1986 al 30 de octubre de 1986. Regresó a su oficina el 30 de abril de 1996 quejándose de intranquilidad, insomnio y uso de alcohol frecuente. Fue referido al First Hospital Panamericano con el diagnóstico de Alcoholismo y Distimia Secundaria.

c. Dr. Raúl Benítez-Psiquiatra- 8 de mayo de 1998- Lo atendió mensualmente desde el 2 de enero de 1998 hasta el 15 de abril de 1998. Señala que estuvo recluido en el San Juan Capestrano y posteriormente en la CPC Clínica del Norte desde el 8 al 27 de enero 1998. Tiene historial de depresiones recurrentes desde el 1985, así como de uso de bebidas alcohólicas. En la última visita se presenta adecuadamente vestido y aseado. Es cooperador, pero poco comunicativo. Tiene algunos bloqueos. Es lógico, coherente y relevante. No se reportan ideas suicidas u homicidas. No hay distorsiones psicóticas de la realidad. Su estado emotivo refleja ansiedad y depresión. Está bien orientado en las tres esferas. Memoria inmediata y reciente menoscabada. Juicio, atención y concentración pobre. Diagnóstico: Depresión Mayor Severa recurrente. RX; Proxac 20 mg diarios.

d. Dr. Rodrigo Freytes- Psiquiatra- 27 de mayo de 1999 - Se presenta correctamente vestido y aseado. Cooperador y espontáneo. Normal su actividad psicomotora, no trastornos en la producción del pensamiento. Lógico, coherente y relevante. No alucinaciones o ideas delirantes. Animo deprimido y ansioso. Parcialmente orientado en tiempo. Memoria global conservada. Funciones intelectuales y juicio conservado. Buena la atención, concentración deficiente. Del informe se desprende además que éste hace uso de bebidas alcohólicas y es por eso que está recibiendo tratamiento. Según informa el apelante, últimamente ha tenido una leve mejoría de la condición emocional. Se relaciona bien con familiares. En cuanto a las actividades diarias da mantenimiento al patio, lava los automóviles y pinta la casa. Participa en actividades grupales, asiste a la iglesia. Diagnóstico: Depresión Mayor Moderada; Dependencia Alcohólica. GAF: 55-60. Rx: Zanax lmgs y Paxil 10 mg qd. Puede manejar sus fondos.

e. Notas de progreso del Centro de Salud CAPITAS de Arecibo cubriendo visitas regulares desde el 13 de diciembre de 1999 hasta el 1ro. de junio de 2001. En la primera visita se establecieron los siguientes diagnósticos: Trastorno Depresivo Mayor y Trastorno de Dependencia al Alcohol. GAF: 60. Se inició el tratamiento en Trazodone 50 mg am y 100 mh hs. En la segunda visita el 14 de enero de 2000 presenta una marcada mejoría. Participante expresa: “me siento mucho mejor, duermo toda la noche”. Niega alucinaciones, ideas suicidas u homicidas. Lógico, coherente y relevante. Memoria conservada. Afecto adecuado. Refiere tener mas ánimo. Tiene más apetito. Se le prescribe Trazodone 150 mg hs. En julio de 2000 se descompensa. Aislado y poco comunicativo, deambulando durante la madrugada, descalzo y en 
*202
pijama, inquieto y con ideas autodestructivas. Se refiere a hospitalización el 18 de julio de 2000. En la visita de 2 de octubre de 2000 indica que no hace uso de bebidas alcohólicas desde hace tres meses. “Se siente bastante bien con las medicinas. “Está lógico, coherente y relevante. Niega alucinaciones, ideas suicidas u homicidas. En las últimas dos visitas reportadas el 17 de abril y 1ro. de junio de 2001 presenta una marcada mejoría. Asiste solo a la entrevista. Correctamente vestido, limpio y afeitado. Explica que está mejorando y durmiendo bien. Niega alucinaciones, ideas suicidas u homicidas. Bien orientado en las tres esferas. Se observa alerta, tranquilo y cooperador. Pensamiento Lógico, coherente y relevante. Animo adecuado. ”

27. Dr. Alfredo Hurtado de Mendoza-Asesor Médico -15 de enero de 2002- Señala que la última evidencia médica presentada (notas de progreso) describe una marcada mejoría con una respuesta excelente al tratamiento. Sin hacer uso de bebidas alcohólicas en los últimos meses y con un control satisfactorio de sus emociones. En buen contacto don la realidad. No alcanza la severidad de los listados 12.02 y 12.04para una 1N0 emocional.

28. En apelación, la prueba adicional sometida por el apelante consistió de evidencia relativa a su condición emocional únicamente”.

El recurrente sometió la siguiente evidencia médica con relación a su condición emocional, la cual también fue tomada en cuenta por la Junta. Dicha evidencia consistió de lo siguiente, según expuesto por el recurrente en su escrito de revisión:

“1. Informe Médico del Dr. Juan A. Guillén, Psiquiatra, fechado el 2 de junio de 1986 donde le hace un diagnóstico de Desorden de Ansiedad Severo y en cuanto a las recomendaciones nos dice que:

‘Debido a la severidad de su condición afectiva se recomienda tratamiento en descanso’.

En la primera página de este Informe, el doctor Guillén, Psiquiatra, nos dice que:

‘Paciente refiere sentirse intranquilo, le molestan los ruidos, no duerme bien, pesadillas frecuentes, temblor por dentro. ’

Este galeno nos menciona en la segunda página del Informe que el apelante tiene retardación psicomotora y que se observó durante la entrevista tenso y en el borde del sillón. Nos dice también que presentó quejas somáticas y emocionales.

2. Evaluación Médica del Dr. Carlos Grovas Badrena, Ortopeda, fechado el 14 de septiembre de 1987 donde le diagnostica: Síndrome Doloroso hombro izquierdo, post traumático y Tendinitis bicipal hombro izquierdo. Las recomendaciones de este galeno son: ‘Referir a Reumatólogo consultor del Asegurador para infiltración con esteroides. ’

Récord Médico de la Corporación del Fondo del Seguro del Estado del Caso Número: 93-07-4845 donde se encuentran los siguientes documentos:

1. Estudio titulado “Lower Extremity Nerve Conduction Examination” fechado el 23 de marzo de 1994 donde le diagnostican “Peripheralpolyneuropathy”.

2. “MRI of the Lumbosacral Spine” fechado el 13 de febrero de 1995 donde le diagnostican: “Degenerative L4-L5 disc disease, Suggested disc bulges at the L3-L4, L4-L5 and L5-S1 interspaces”.

3. Evaluación neurológica del Dr. Héctor R. Stella, Neurocirujano, fechada el 6 de diciembre de 1993 
*203
donde le diagnostica: “Lumbosacral Sprain, HNP L5-S1, Bulging disc L4-L5 and L5-S1”.

4. “CT of Lumbar Spine” fechado el 2 de julio de 1993 donde nos dice que: “Study compatible with bulging annulus fibrosus and small left posterior disc profusion with wild compression of the dural sac at L4-L5. There is also bulging annulus fibrosus with small central disc profusion and mild compression of the dural sac at L5-S1.” (Apéndice V)

e) Certificado Médico del Dr. Juan A. Guillén, Psiquiatra, fechado el 1 de mayo de 1996 donde le hace un diagnóstico de: “Trastorno por Ansiedad Severa con Depresión.” (Apéndice VI)

f) Informe Médico titulado “Mental Impairment Evidence Report” del Dr. R. Benitez, Psiquiatra, fechado el 8 de mayo de 1998 donde le hace un diagnóstico de Depresión Mayor Severa y Recurrente y nos da un pronóstico: POBRE. (Apéndice VIII)”

Este galeno nos dice que el apelante no tiene habilidad para manejar fondos y le da un GAF de 40.
En la primera página del Informe Médico en inciso (1) nos dice que:

“Paciente presenta aislamiento social, llanto fácil, pérdida de interés en todo tipo de actividad placentera [anhedonia]. Paciente con insomnio crónico. Baja autoestima. Afecto deprimido, Ansioso.’

En el inciso (2) nos dice que la frecuencia de las visitas son mensuales.

En el inciso (4)(a) nos dice que: ‘Paciente ha venido presentando depresiones recurrentes desde 1985 y 1993.’

En el inciso (4)(b) nos dice que el apelante estuvo hospitalizado en la Clínica del Norte por su condición emocional del 8 de enero de 1998 al 27 de enero de 1998 y que estuvo en San Juan Capestrano previamente hospitalizado.

En el inciso (5) nos dice que: ‘Paciente se aísla, no comparte con familiares, aislamiento constante.’

En el inciso (6) nos dice que: ’Paciente con quejas somáticas constantes, falta de concentración y atención. Memoria afectada. Desmotivación constante. ’

En el inciso (8)(c) nos dice que el apelante sufre de miedos y fobias constantes.

En el inciso (8)(d) nos dice que el Afecto es Deprimido y el talante Ansioso.

En el inciso (8)(f) aparece con la memoria inmediata y reciente menoscabada.

En el inciso (8)(h), el juicio social es POBRE.

En el inciso (8)(j), la atención y concentración es POBRE.

En el inciso (9)(d) nos dice que el apelante padece de: ‘Pobre tolerancia a situaciones de estrés, no planifica, no toma decisiones por sí solo, todo lo delega en su esposa. ’

g) Récord Médico del Centro de Salud Mental llamado Cápitas donde le hacen un diagnóstico de Depresión Mayor y Trastorno de Dependencia Alcohol. (Apéndice X padece de: ‘tristeza, insomnio, se siente 
*204
desganado, sin energías, con disminución de apetito, con pobre concentración, se le olvidan las cosas fácilmente, con pérdida de interés por actividades placenteras, niega ideas suicidas, con episodios frecuentes de irritabilidad. ’

En la Nota de Progreso del 3 de julio de 2000 nos dicen que: ‘Paciente viene con esposa. Esta expresa que paciente se va a caminar por la noche en payama por la calle. Otras veces se va para la carretera y se para delante de los carros. Le esconde el teléfono. Otras veces no quiere salir con ella. Paciente habla poco, no mantiene contacto visual. Responde con monosílabos. ’

En las notas de progreso del 18 de julio de 2000 nos dicen que: ‘Esposa de paciente refiere que paciente está bien intranquilo, camina de mi lado a otro, agresivo verbalmente, en ocasiones olvidadizo, con ideas de quitarse la vida, deambula de madrugada descalzo y en pijamas. Esposa teme que se ahogue, ya que insiste en ir a la playa consistentemente de día o de noche. Ansioso continuamente, se baña 3-4 veces el día. Se recomienda la hospitalización inmediata para evitar que se haga daño a sí mismo o a otras personas. ’

‘Esposa trae dibujo y nota del paciente donde escribe que ‘el demonio está dentro de él. ’

Récord Médico del Hospital Alejandro Otero López donde lo hospitalizaron por ideas suicidas u homicidas el 22 de julio de 2000. (Apéndice XVI)

Carta de la Policía de Puerto Rico fechada el 30 de abril de 1998 donde nos dicen que: ‘Recientemente, en nuestra División de Licencias de este Negociado, recibimos Informes Médicos del Fondo del Seguro del Estado, donde le recomiendan la separación del servicio de José L. Padín Medina debido a que su condición le incapacita para desempeñar las funciones de su cargo. ’

‘A base de dicha recomendación someto a su oficina una solicitud de retiro por condición emocional. ’

K) Sentencia del Tribunal Superior, Sala de Arecibo, del 13 de noviembre de 1996 donde se le ingresa interno al Hospital Panamericano de Cidra para que reciba tratamiento para su condición.

l) Evaluación Neurológica de la Dra. Evelyn Rodríguez Ajá, Neurólogo y Asesora de la Administración de los Sistemas de Retiro, donde le hace los siguientes diagnósticos: Esguince lumbar, Enfermedad Degenerativa de Disco L4-L5 y Status Post Trauma en rodilla Derecha.

m) Informe Médico titulado ‘Mental Impairment Evidence Report’ del Dr. Rodrigo Frey tes, psiquiatra y Asesor Médico de la Administración de los Sistemas de Retiro del Gobierno, fechado el 27 de mayo de 1999, donde le hace los siguientes diagnósticos: Depresión Mayor-Moderada; Dependencia al Alcohol. Le da un GAF de 55 a 60%.

En el inciso (1) de la primera página de este Informe nos dice que:

“El reclamante dice que hace tiempo que padece condición emocional (cree que pudo ser para 1985, no está seguro). Recibió tratamiento psiquiátrico con el doctor Guillén, Psiquiatra, en Arecibo. Informa que se trata desde 1985 con este psiquiatra, el cual ha visitado regularmente hasta hace dos años. Luego fue ingresado en el Hospital Panamericano y después en el Hospital Capestrano. Después de salir del hospital, ha continuado visitando las facilidades de tratamiento ambulatorio del Capestrano en Arecibo. Informa que casi no duerme, que le recetan Xanax, siempre está temblando. A veces ni siquiera puede firmar. Se le olvidan las cosas.”

*205 II
Cuestión Planteada
Al solicitar que revoquemos a la Junta, el recurrente imputa a dicho organismo administrativo haber incidido en los siguientes cinco errores:

“Erró la Honorable Junta de Síndicos del Sistema de Retiro, en la interpretación que hace de la ley y el reglamento, ya que produce resultados inconsistentes con, o contrarios, al propósito de la ley y llevada a la comisión de una injusticia.

Erró la Honorable Junta de Síndicos en darle más peso a unos resúmenes de expedientes de los asesores médicos de la administración, en vez de darle más peso a la evidencia médica de tratamiento del peticionario y a las hospitalizaciones que ha recibido.

Erró la Honorable Junta de Síndicos en la definición de lo que es una persona incapacitada total y permanentemente, según la Ley Número 447 del 15 de mayo de 1951.

Erró la Honorable Junta de Síndicos en concluir que la parte recurrente no presenta un cuadro de incapacidad total y permanente para trabajar y en no tomar en consideración la combinación de condiciones del apelante.

Erró la Honorable Junta de Síndicos al no evaluar la capacidad funcional del peticionario para hacer otro trabajo remunerativo, a la luz de su edad, preparación académica y experiencia de trabajo.”

Dichos señalamientos de error podemos contraerlos a resolver si la Junta, al denegarle al recurrente los beneficios de una anualidad por incapacidad ocupacional o no ocupacional, actuó de manera ilegal, arbitraria o irrazonable; o si por el contrario, su determinación administrativa está sustentada por evidencia sustancial contenida en el expediente administrativo sometido por las partes.
III
Conclusiones de Derecho y Análisis de la Cuestión Planteada
A
El Derecho y la Reglamentación Aplicable al Retiro por Incapacidad
El Sistema de Retiro para los empleados del Estado Libre Asociado de Puerto Rico se rige por la Ley Núm. ■ 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. see. 761 etseq.
En lo relevante al caso de autos, para el 28 de agosto de 1998 -fecha en que el recurrente presentó a Retiro su solicitud de incapacidad-, el Artículo 10 de la Ley Núm. 447, supra, 3 L.P.R.A. sees. 770, disponía lo siguiente:
Artículo -10

“Todo participante que, teniendo por lo menos 10 años de servicios acreditables, se inhabilitare total y permanentemente para el servicio, debido a un estado mental o físico no provocado por hábitos viciosos, intemperancia o mala conducta; y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado; o para trabajar en cualquier clase de empleo retribuido por lo menos con una retribución igual a la que perciba, tendrá derecho a una anualidad por incapacidad no ocupacional. El retiro del participante tendrá lugar a petición o 
*206
solicitud suya; o a petición del jefe de su departamento u oficina, mientras esté en servicio el mencionado participante; y de acuerdo con las reglas sobre anualidades por incapacidad provistas en el Artículo 11 de esta ley.

Al retirarse por incapacidad, todo participante recibirá una anualidad igual al 30% de la retribución promedio por los primeros 10 años de servicios acreditables, más el 1% de la retribución promedio por cada año de servicios acreditables en exceso de 10 años. La anualidad no excederá en ningún caso del 50% de la retribución promedio. Si el participante hubiere ingresado por primera vez ál Sistema después del 1ro. de abril de 1990, al retirarse por incapacidad recibirá una anualidad igual al 25% de la retribución promedio por los primeros 10 años de servicios acreditables más el 1% de la retribución promedio por cada año de servicios acreditables en exceso de 10 años pero en ningún caso la anualidad excederá el 40% de la retribución promedio calculada según se establece en el Artículo 6B de esta ley. Hasta el 31 de diciembre de 1960, en los casos de participantes que al 31 de diciembre de 1951 eran miembros de sistemas de pensiones sobreseídos, la anualidad de retiro por incapacidad no ocupacional no será menor de la que le hubiere correspondido de acuerdo con las disposiciones de los sistemas sobreseídos.

En cualquier caso en que se descubriere que la incapacidad del pensionado persiste por razones de intemperancia, mala conducta o hábitos viciosos, el Administrador tendrá autoridad para suspender el pago de la anualidad por incapacidad. En tal caso se reembolsará al pensionado el exceso, si lo hubiere, representado por la diferencia entre las aportaciones acumuladas hasta la fecha del retiro, y la suma total pagada por concepto de la anualidad por incapacidad.” (Subrayado nuestro)
En el ámbito administrativo, Retiro ha adoptado ciertas reglas para poner en vigor las disposiciones de la Ley Núm. 447, supra. Se trata del Reglamento General para la Concesión de Pensiones, Beneficios y Derechos, Núm. 4930 de 25 de junio de 1993. 
La Regla 24 de dicho cuerpo reglamentario, al cubrir lo relacionado con las pensiones por incapacidad ocupacional, establece que para tener derecho a una pensión se tiene que cumplir con ciertos requisitos. La Regla 24.2 enumera los mismos de la siguiente manera:

“(a) que el participante esté en el servicio activo a la fecha de radicación de la solicitud;

(b) que se reciba suficiente prueba médica en cuanto a la incapacidad mental o física del participante;

(c) que el Fondo del Seguro del Estado haya determinado que la condición incapacitante esté relacionada con el empleo del participante y es compensable; y

(d) que el participante o su patrono notifique dicha incapacidad por escrito al Administrador, dentro de los (6) meses siguientes a la fecha en que el Fondo... haya determinado que la condición incapacitante está relacionada con el empleo del participante”.

En materia de incapacidad no ocupacional, la Regla 25.3 del Reglamento dispone que:

“Para tener derecho a una pensión por incapacidad no ocupacional, el participante deberá cumplir con los siguientes requisitos:

(a) tener por lo menos diez (10) años de servicios acreditables;

(b) estar en servicio activo a la fecha de radicación de la solicitud;

*207
(c) aue la incapacidad física o mental no haya sido provocada por hábitos viciosos, intemperancia o mala conducta;

(d) aue se reciba suficiente prueba de la incapacidad del participante, aue demuestre aue está incapacitado total y vermanentemente vara cumplir con los deberes de cualquier carso aue en el servicio del patrono se le hubiese asisnado o para trabajar en cualquier clase de empleo retribuido, por lo menos con una retribución isual a la aue tenía derecho a estar percibiendo estando en servicio activo.” (Subrayado nuestro)
La Regla 24.4 del mismo Reglamento define con precisión cuándo se considerará a un participante incapacitado, al disponer lo siguiente:
“Si de la evidencia médica que consta en el expediente y conforme al listado de criterios médicos (“Adult Listings”) [3] establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre la incapacidad y someterá su recomendación al Administrador. Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado de cumplir los deberes de cualquier carso aue su patrono le hubiere asisnado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos isual a la que esté percibiendo”. (Subrayado nuestro).
La Regla 25 establece las normas para la concesión de pensiones por incapacidad no ocupacional. La Regla 25.1 define este tipo de incapacidad de la siguiente manera:
“Todo participante que se inhabilite total y permanentemente para el servicio por causas no relacionadas con el empleo, tendrá derecho a solicitar una anualidad por incapacidad no ocupacional”. (Subrayado nuestro)
Finalmente, la Regla 25.4, en esencia, define lo que habrá de considerarse como incapacidad, cuando dispone en lo pertinente que:
Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier carso aue su patrono le hubiere asisnado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos isual a la aue esté percibiendo”. (Subrayado nuestro)
B
El Derecho Aplicable a la Revisión de las Determinaciones de Agencias Administrativas
La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que éstas desempeñan sus funciones conforme a la Ley. Torres Acosta v. Junta, 161 D.P.R. _ (2004), 2004 J.T.S. 71; Miranda v. C.C.C., 141 D.P.R. 775, 786 (1996). De ahí, que la revisión judicial debe limitarse a determinar si la agencia actuó arbitrariamente, ilegal o en forma tan irrazonable que la actuación constituye un abuso de discreción. Torres Acosta v. Junta, supra; Franco v. Departamento de Educación, 148 D.P.R. 703, 710 (1998).
Las conclusiones e interpretaciones de las agencias administrativas especializadas merecen gran *208 consideración y respeto por los Tribunales. Otero v. Toyota, _ D.P.R. ___ (2005), 2005 J.T.S. 13; O.E.G. v. Igartúa de la Rosa, 157 D.P.R. _ (2002), 2002 J.T.S. 120; Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D. P.R. 70, 72 (2000); M&V Orthodontics v. Negdo. de Seguridad de Empleo, 115 D.P.R. 183, 188 (1984).
La revisión judicial de las determinaciones de hechos de las agencias administrativas está limitada por lo establecido en la sección 4.5 de la Ley de Procedimiento Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2175. De acuerdo con esta disposición, las determinaciones de hechos formuladas por las agencias administrativas serán sostenidas por los Tribunales, si están apoyadas por evidencia sustancial que obra en el expediente administrativo. No obstante, las conclusiones de derecho son revisables en todos sus aspectos. Torres Acosta v. Junta, supra; O.E.G. v. Román González, 159 D.P.R. _ (2003), 2003 J.T.S. 74; Miranda v. Comisión Estatal de Elecciones, 141 D.P.R. 775, 787 (1996).
La facultad de revisión judicial en estos casos ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba; y (3) si las conclusiones de derecho del organismo administrativo son correctas. See. 4.5 de la Ley Núm. 70, supra; P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 281 (2000); Mun. de S.J. v. J.C.A., 149 D.P.R. 263, 279-280 (1999); Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 674 (1997). El récord o expediente administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjuticativo y para la revisión judicial ulterior. Torres Acosta v. Junta, supra; Mun. de S.J. v. J.C.A., supra, pág. 280.
Es norma reiterada que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo. Otero v. Toyota, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, 161 D.P.R. _ (2004), 2004 J.T.S. 4; Asoc. Vec. H. San Jorge v. U. Med. Corp., supra, pág. 72; E.L.A. et als. v. Malavé, 157 D.P.R. _ (2002), 2002 J.T.S. 103; Domínguez v. Caguas Expressway Motors, Inc., 148 D.P.R. 387, 397 (1999); T. JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80 (1999).
El criterio bajo el cual un tribunal debe revisar las determinaciones de hechos e interpretaciones de una agencia administrativa es el criterio de razonabilidad. Otero v. Toyota, supra; Fuertes y otros v. A.R.P.E., 134 D.P.R., 947, 953 (1993); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975). “Ahora bien, en armonía con la finalidad perseguida, la revisión judicial de decisiones administrativas debe limitarse a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituye un abuso de discreción”. Rebollo Vda. de Liceaga v. Yiyi Motors, supra.
Así pues, al realizar su función revisora, el tribunal está compelido a considerar la especialización y experiencia a la agencia sobre las cuestiones que tuviera ante sí. Por tanto, en el descargo de su función deberá caracterizar entre asuntos de discernimiento estatutario o cuestiones de especialización administrativa. La deferencia reconocida no equivale a la renuncia de la función revisora del tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la aplicación de la ley. Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 94 (1987).
Por otro lado, “al evaluar los casos es necesario distinguir entre cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa.” Rebollo Vda. de Liceaga v. Yiyi Motors, supra; Adorno Quiles v. Hernández, 126 D.P.R. 191, 195 (1990); véanse además, Quiñones v. San Rafael Estates, 143 D.P.R. 756, 774 (1997); Fuertes y otros v. A.R.P.E., supra, pág. 953.
Finalmente, sobre este tema, el foro judicial puede sustituir el criterio del organismo administrativo por el propio, únicamente en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. Rebollo Vda. de Liceaga v. Yiyi Motors, supra. “No obstante, es axioma judicial que ante la *209 prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.” Rebollo Vda, de Liceaga v. Yiyi Motors, supra; Dye Tex de P.R. v. Royal Ins. Co., 150 D.P.R. 658, 660 (2000).
IV
Análisis de la Cuestión Planteada
Sobreponiendo las normas de derecho antes expuestas a los hechos del presente caso, somos de opinión que las determinaciones de hechos de la Junta están sostenidas por la prueba recibida, y que las conclusiones de derecho a que ésta llegó son correctas. El recurrente no ha demostrado, con base en la prueba presentada, que la determinación denegatoria de los beneficios por incapacidad ocupacional y la concesión de una incapacidad de naturaleza no ocupacional no está justificada por el derecho aplicable y por una evaluación justa del peso de la prueba que la recurrida tuvo ante su consideración. Rebollo Vda. de Liceaga v. Yiyi Motors, supra. Veamos.
De la resolución emitida por la Junta, se desprende que todos los informes médicos y la evidencia sometida fue considerada al momento de evaluar la elegibilidad del recurrente para los beneficios de una pensión.
Un ponderado análisis, como el que hiciera la Junta en su resolución, refleja que el recurrente sufrió dos accidentes relacionados con su trabajo que le merecieron recibir tratamiento en el Fondo del Seguro del Estado. Al determinar denegar la concesión de incapacidad en el caso de autos, la Junta concluyó que la condición emocional que aqueja al recurrente está vinculada a un problema de alcoholismo.
Examinado lo pertinente del expediente administrativo sometido ante nuestra consideración por las partes, concluimos que no se justifica la revocación de la resolución de la cual se recurre. Torres Acosta v. Junta, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra.
Como se establece en la normativa legal antes reseñada, el Artículo 10 de la Ley Núm. 447, supra, impone criterios estrictos para determinar cuándo un empleado está total y permanentemente incapacitado para cumplir con los deberes de un cargo; criterios que puedan ser más rigurosos que los requisitos de la Administración Federal de Seguro Social, la Corporación del Fondo del Seguro del Estado o los de cualquier otro organismo con propósitos remediales. Claramente, esta disposición estatutaria requería para cuando el recurrente radicó su solicitud de incapacidad ante Retiro, que su inhabilidad para trabajar no podía ser ocasionada por “hábitos viciosos, intemperancia o mala conducta”.
La Junta consideró las evaluaciones médicas realizadas por los especialistas y sostuvo que los padecimientos alegados por el recurrente no ameritan una pensión o anualidad por incapacidad ocupacional o no ocupacional. También tomó en cuenta la evidencia médica presentada por el recurrente, el propio testimonio de éste y la totalidad del expediente del caso. Por tanto, debemos deferencia a dicho dictamen. Fuertes y otros v. A.R.P.E., supra; Murphy Bernabé v. Tribunal Superior, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra.
El recurrente no nos ha demostrado que existe otra prueba en el expediente administrativo que reduzca o menoscabe el valor probatorio de la evidencia tomada en cuenta por la Junta, hasta el punto que no sea posible concluir que su determinación fue razonable. Véase, Otero v. Toyota, supra; Rebollo Vda. de Liceaga v. Yiyi Motors, supra.
V
Disposición del Recurso
Por los fundamentos antes expuestos, se confirma la resolución de la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno, dictada el 19 de agosto de 2004, *210 mediante la cual se denegó al recurrente una anualidad por incapacidad ocupacional o no ocupacional.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones