Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| ANA HILDA ALVARADO ASTACIO; RAFAEL ROSARIO GARCÍA<br><br>Recurrida<br><br>v.<br><br>FREEDOM FOREVER PUERTO RICO, LLC; SUN RUN, INC.<br><br>Recurrente | TA2025RA00150<br><br>consolidado con<br><br>TA2025RA00156 | REVISIÓN JUDICIAL Procedente del DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR<br><br>Querella Núm.: PON-2024-0005477<br><br>Sobre: Contrato de obras y servicio |

Panel integrado por su presidenta la Jueza Rivera Marchand, la Jueza Mateu Meléndez y la Jueza Boria Vizcarrondo.

Mateu Meléndez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de septiembre de 2025.

Mediante *Recurso de Revisión* presentado ante este Tribunal de Apelaciones el 13 de agosto del año en curso, Sunrun PR Operations, LLC y/o Sunrun, Inc., (en adelante Sunrun) compareció a solicitarnos la revocación de la *Resolución* dictada y notificada en el caso de epígrafe con fecha del 10 de junio de 2025. Por virtud del aludido dictamen, el Departamento de Asuntos del Consumidor (DACo) ordenó la resolución del contrato suscrito entre la Sra. Ana H. Alvarado, Rafael Rosario García (los recurridos) y Sunrun y ordenó la remoción del sistema de placas solares instalado en la residencia de los primeros.

Al día siguiente, Freedom Forever Puerto Rico (Freedom) presentó un *Recurso de Revisión Judicial* mediante el cual solicitó revisión del dictamen aludido en el párrafo anterior.[1] Evaluados ambos legajos, y al amparo del

---

[1] Mediante *Resolución* emitida el 19 de agosto de 2025, ordenamos la consolidación de ambos recursos por impugnar el mismo dictamen, en el mismo caso y entre las mismas partes.

derecho que más adelante consignamos, resolvemos confirmar el dictamen recurrido.

-I-

Los hechos del caso son sencillos. El 21 de agosto de 2024, los recurridos presentaron una *Querella* ante el DACo. Allí, indicaron que desde que se instaló el sistema de placas solares el 10 de junio de 2024, el sistema no ha funcionado correctamente. Igualmente, adujeron que, pese a los reclamos hechos a Freedom y varias visitas de técnicos, los apagones y falta de electricidad continuaba, perdiéndose alimentos y medicamentos refrigerados. Como remedio, solicitaron la cancelación del contrato, la remoción del sistema de placas solares, la reparación de los agujeros en las paredes y techos y costear la pérdida de alimentos refrigerados, medicamento y enseres.[2]

El 5 de febrero de 2025, Freedom contestó la *Querella*. Al hacerlo, negó las alegaciones levantadas por los recurridos y presentó sus defensas. Así las cosas, el 10 de marzo del año en curso, Sunrun presentó ante el DACo una *Moción de Desestimación por Falta de Jurisdicción*. En síntesis, negó que el DACo tuviera inherencia en la controversia y aseveró que la agencia estaba impedida de actuar directamente sobre asuntos sobre la producción de energía. Asimismo, reclamó que el contrato suscrito entre las partes contenía una cláusula de arbitraje que obligaba a que cualquier controversia se atendiera mediante ese método de resolución de conflictos, por lo que el DACo tampoco podía intervenir en la cuestión ante él.

El 20 de marzo de 2025, Freedom también solicitó la desestimación de la *Querella*. En su escrito, reclamó la falta de parte indispensable y no tener vínculo contractual alguno con los recurridos. Bajo estas razones, reclamó que el DACo carecía de jurisdicción. Al día siguiente, se celebró la

---

[2] La Querella fue enmendada el 20 de diciembre de 2024 para incluir a todas las querelladas de epígrafe.

vista administrativa de manera virtual. Tras evaluar la evidencia desfilada en la audiencia, el DACo emitió la resolución recurrida. Allí, consignó 34 determinaciones de hechos. Añadió también un listado de 15 hechos tomados de la declaración hecha por el testigo de Freedom, el Sr. Héctor Pérez Pagán. Si bien es una lista un poco extensa, nos parece necesario reproducir los hechos determinados por el DACo. Estos son:

A. Los querellantes recibieron en su hogar en Montellano en Ponce al vendedor de nombre Chris Royal, **quien representaba a ambas partes querellantes Sunrun Inc. (en adelante la querellada Sunrun) y a Freedom Forever Puerto Rico, LLC (en adelante la querellada Freedom).** Este vendedor fue referido por un familiar de los querellantes.

B. La querellante declaró que ella y su esposo, ambos tienen condiciones de salud y por esto estaban interesados en obtener un sistema solar para no perder sus medicamentos cada vez que se iba la luz (sistema back up).

C. Conforme declaró la querellante cuando el vendedor los visitó para orientarlos en principios del año 2024, les solicitó su factura de luz de [LUMA] y les indicó que el sistema solar funcionaria para tener luz cuando [LUMA] fallara. El vendedor le indicó que tendrían 12 placas en su residencia y una batería. **El vendedor le indicó que una vez instalaran el sistema, no tendrían ningún problema de electricidad.**

D. El vendedor de las partes querelladas Sunrun y Freedom orientó a ambos querellantes sobre un pago de $134.00 mensuales por el sistema solar, en modo de alquiler por 25 años. Que tendrían el programa de medición neta y no pagarían casi nada de luz.

E. La querellante le indicó al vendedor que tenía un sistema de Danosa en su techo y que estaba bajo garantía, que no quería que lo dañaran porque perdería la garantía, **el vendedor le indicó que ellos le darían garantía luego de perforar la Danosa, que no preocupara.**

F. Luego el vendedor de las partes querelladas Sunrun y Freedom le mostró a los querellantes en una tableta unos documentos a firmar, **de manera bien rápida** en febrero de 2024. **La querellante declaró que no leyeron en ningún momento esos documentos, solo firmaron donde el vendedor Chris les indicaba. En adición nunca recibieron copia de ese documento que firmaron. El vendedor no explicó nada de lo que decía el contrato.**

G. El 10 de junio de 2024[,] le culminaron de instalar el sistema solar en su hogar a los querellantes.

H. A los dos días de culminar la instalación, la querellante no se encontraba en su hogar y su padre visitó la residencia para verificar que estuviera todo bien en su hogar, ya que habían culminado la instalación del sistema. Conforme declaró la querellante cuando su padre verificó su hogar encontró agua junto a la nevera del primer piso y todos los alimentos dentro de la nevera estaban calientes. El padre del querellante tom[ó] un video sobre lo encontrado y se lo envió a la querellante. Luego subió al segundo piso de la residencia y cuando verifica todo el piso se encontraba mojado. La querellante le indicó a su padre de 81 años que no se preocupara que ella lo verificaría cuando regresara.

I. Cuando la querellante regresó a su hogar en junio de 2024 encontró todos los alimentos dañados dentro de las neveras y el sistema de placas solares no estaba funcionado.

J. La querellante inmediatamente comenzó a comunicarse con Freedom en múltiples ocasiones (más de 10 llamadas) y con Sunrun para informar el problema del sistema.

K. El personal de Freedom le indicaba que harían una boleta para que los técnicos visitaran su hogar. El personal de Sunrun que la atendió le indicó que entendía la situación, pero que como Freedom no había culminado la medición neta, ellos no [tenían] aun jurisdicción sobre su caso.

L. La querellante declaró que debido a sus reclamos fueron en los meses de junio y julio de 2024 alrededor de cinco (5) técnicos de Freedom. El primer técnico que visitó su hogar le indicó que habían realizado un desbarajuste en la instalación, que habían mezclado cables de las placas con los de [LUMA], que le cambiarían todos los cables. Los técnicos de Freedom cambiaron los cables. Sin embargo[,] conforme declaró [la] querellante cuando se fue la luz el sistema no funcionó. Luego cada técnico que la visitaba verificaba el sistema y le decían que estaba todo bien en el sistema. Otro técnico le indicó que el problema era por [LUMA], en fin, cada técnico le indicaba algo diferente.

M. La querellante declaró que el sistema de placas mientras había luz de [LUMA] funcionaba, pero cuando la luz de [LUMA] se iba, el sistema tumbaba. Por lo cual se quedan sin luz en su hogar.

N. La querellante declaró que siempre que los técnicos iban a su hogar había luz de [LUMA], por lo cual no podían verificar si lo realizado funcion[ó] o no, pero cuando se iba la luz el sistema apagaba. El sistema nunca mejoraba, continuaba pasando lo mismo.

O. Luego pasó la tormenta Ernesto y la residencia de la querellante estuvo tres días sin luz de [LUMA] y el sistema no funcionó tampoco en ningún momento. La querellante llamó nuevamente a Freedom, pero los técnicos indicaron que no podían ir por la tormenta.

P. **La querellante declaró** que cuando comenzaron a tener problemas con el sistema, fue que esta solicitó copia del contrato firmado. Por esta razón a su solicitud mediante correo electrónico el 15 de agosto de 2024 le remitieron una copia del contrato.[1]

Q. Los querellantes recibieron el contrato en agosto y el mismo está en el idioma inglés. **La querellante declaró que ella no sabe inglés, que es muy poco o nada lo que ella entiende de ese contrato y por lo que ha podido traducir.** La querellante indicó que el contrato tiene el nombre del vendedor Chris Royal y el de la parte querellada Sunrun. **Conforme declaró la querellante en ningún momento el vendedor les mostró el contrato, ni les habl[ó] sobre cláusula de arbitraje.**

R. En diciembre de 2024, la querellante contrató un perito electricista licenciado, Ricardo Rivera Vélez, licencia # 9222-443, quien realizó una certificación[2] en su residencia e indicó: "Se hizo toma de voltajes después de interrupción de servicio de [LUMA] y el sistema solar no dio lectura de voltaje. Se instaló servicio de [LUMA] y la casa tiene servicio."

S. **Conforme declaró la querellante <u>el sistema no cumple con lo indicado por el vendedor de que funcionaria cuando se fuera la luz y no lo ha hecho hasta el presente.</u> Las placas no están funcionando. Se va la luz de [LUMA] y las placas dejan de funcionar. <u>No han cumplido nada de lo prometido.</u> Ha sido una pesadilla toda la situación. Nunca han tenido luz con las placas cuando se va la luz de luma <u>como lo prometido.</u>**

T. En dos ocasiones los querellantes han perdido toda la compra de alimentos, en adición han perdido medicamentos costosos[3] que tienen que estar en la nevera.

U. El 21 de agosto de 2024 la parte querellante realizó la querella que nos ocupa.

V. Luego de la querellante realizó la querella, no permitió que el personal de Freedom regresara a su hogar a bregar con el sistema hasta que se viera la querella de DACO, además de que ya había ido en múltiples ocasiones y no resolvían nada. Solo permitió una vista ocular acordada entre los abogados de ambas partes.

W. **La querellante plantea que Freedom nunca ha cumplido con nada de lo acordado. Freedom nunca completó la medición neta.** Sunrun no ha cobrado nada del contrato, ya que Freedom no ha completado la medición neta y que continúan pagando las facturas de luz a [LUMA].

X. El querellante Sr. Rosario, esposo de la querellante declaró que fue la persona que firmó el contrato[4] de Sunrun para adquirir el sistema de placas solares que están instaladas en su hogar. **El vendedor le mostró en una tableta y le indicaba donde firmar en unos cuadritos y que el financiamiento sería con Sunrun, pero nunca le mostró el contenido del contrato.**

Y. **El vendedor les habló siempre de ahorro de energía y que, si se iba la luz de [LUMA], el sistema funcionaria con la batería.**

Z. **El día que firmaron en la tableta, el vendedor nunca le habló sobre lo que decía el contrato, solo el vendedor le indicó que tendrían 12 placas y una batería que serviría de backup que funcionaría si se iba la luz de d[í]a o en la noche.** El costo mensual a pagar a Sunrun ser[í]a de $134.00 mensual, por un alquiler de 25 años.

AA. **El querellante no sabe lo que es arbitraje y el vendedor nunca le explicó lo que eso significa. En esta vista es la primera vez que escucha sobre eso.**

BB. **El querellante sabe muy poco del idioma inglés y cuando le enviaron en agosto de 2024 el contrato está en inglés, por lo cual no lo entiende.**

CC. **El querellante interesaba las placas por su condición de salud de Apnea del sueño, ya que tiene que dormir conectado a una máquina, desea que cuando se vaya la luz el sistema suba y puedan tener luz.**

DD. El querellante declaró que las facturas que ellos pagaban a [LUMA] antes de [adquirir] el sistema eran entre $60 @ $75 mensual, que a pesar que iban a pagar más de eso con el sistema, lo adquirieron para tener luz cuando [LUMA] fallara por sus condiciones de salud.

EE. El vendedor le indicó que Freedom Forever siempre le daría servicio de ser necesario al sistema de placas solares.

FF. **El sistema nunca [funcionó] como le indicó el vendedor.**

GG. El querellante declaró que nunca recibió instrucciones de como operar el sistema o cambiarlo. Solo instalaron el sistema y nunca le indicaron cambiar modos de autoconsumo o back up. A pesar de que más de cinco técnicos han ido a su hogar nunca les han explicado [cómo] funciona el sistema, ni la batería, ni las placas.

HH. El remedio solicitado por la parte querellante es que se le cancele el contrato, ya que el sistema prometido no sirve, nada de lo prometido ha ocurrido. Solo han tenido perdidas, angustias, impotencia, mala comunicación y mal servicio. En dos meses han ido más de 5 técnicos y nada funciona, han tenido pérdidas de alimentos y medicamentos y más gastos para tener un generador cuando se va la luz. Se le [dañó] el aire acondicionado. La querellante se siente impotente que nadie le resuelve el problema.

II. Del testimonio del señor Héctor Pérez Pagán, gerente de la sucursal de san juan y testigo de la parte querellada Freedom Forever se desprende:

a. El Sr. Pérez es perito electricista con licencia colegiado 9312, vigente desde el 1999.
b. El Sr. Pérez nunca ha estado ni ha visitado la residencia de los querellantes.
c. El Sr. Pérez no conoce al Sr. Chris Royal, vendedor de Freedom Forever y desconoce lo que les prometieron a los querellantes.
d. Freedom Forever realiza diseño del sistema y se delimita a la instalación de este.
e. Hay dos maneras de verificar si el sistema de los querellantes est[á] funcionado o no, ya sea de manera remota o directamente (físicamente) conectándose al sistema.
f. Al presente el sistema indica (de manera remota) que el equipo de los querellantes está funcionando y produciendo, es lo que se ve a través del portal.
g. Las visitas que han realizado los técnicos a los querellantes han sido a solicitud del cliente.
h. No existe un escrito sobre los hallazgos de las visitas de los técnicos a la residencia de los querellantes, ni se les entregan documentos a los clientes, si existe un récord de visitas, pero no con hallazgos.
i. La primera visita a los querellantes fue por el Sr. Ángelo Torres junto a la brigada del sol. En esa vista verificaron el sistema y los parámetros.
j. Estos sistemas se autoprotegen, son sistemas amarrados a la red de [LUMA], si hay altos voltajes de [LUMA] el sistema podría hacer que se apague el sistema.
k. En el año 2024 ha habido más de 80 relevos de carga por parte de [LUMA], que afectan los sistemas.
l. Si hay un alto voltaje de [LUMA], el sistema se apaga.
m. Los sistemas tienen dos funciones, una de generar y otra de servir de back up (respaldo por las baterías). El sistema puede estar en autoconsumo, y no funciona como sistema de respaldo (back up). Si la batería está en reserva, no entra como respaldo cuando falla la luz de [LUMA].
n. Conforme del informe de conexión de los querellantes el sistema de los querellantes está en autoconsumo.
o. El cliente puede cambiar el sistema de autoconsumo a back up en cualquier momento.

(Énfasis nuestro)

Habida cuenta de los hechos antes transcritos, el DACo estableció que del testimonio de los recurridos surgía que el vendedor se presentó ante ellos como un representante de ambas entidades querelladas, por lo que resolvió que no procedía conceder la desestimación de la querella como fue solicitado por Freedom Forever bajo el reclamo de no ser parte del contrato. A su vez, y en virtud de la prueba recibida, el DACo encontró que el sistema de placas solares instalado en el caso no cumplió con el servicio ofrecido, pues no funcionaba cuando se va la luz en la residencia de los recurridos,

perdiéndose alimentos en más de una ocasión y la pérdida del medicamento HUMIRA.

De igual manera, el DACo concluyó que el vendedor incurrió en prácticas engañosas al: realizar falsas promesas; **no ser claro en la divulgación de datos relevantes; no mostrar el contrato firmado, ni darle copia a los recurridos**; y venderles un sistema que alegadamente ahorraría costos de luz, más no cumplió con la verdadera razón por la cual decidieron adquirirlo en primer lugar. Basándose en tales conclusiones, el DACo resolvió el contrato y ordenó la remoción del sistema, así como el arreglo del techo y las paredes, más el pago de $1,100.00. Tanto Sunrun como Freedom solicitaron reconsideración de lo resuelto. El DACo no actuó, por lo que inconformes aun, presentaron respectivos recursos de revisión judicial.

Sunrun, en su recurso TA2025RA00150, señaló la comisión de los siguientes errores:

A. ERRÓ EL DACO-PONCE AL DECLARAR HA LUGAR LA QUERELLA RADICADA POR EL QUERELLANTE.

B. ERRÓ EL DACO-PONCE AL DETERMINAR QUE HUBO DOLO, MAQUINACIONES INSIDIOSAS, FRAUDE Y PRÁCTICAS Y ANUNCIOS ENGAÑOSOS CUANDO DURANTE LA VISTA ADMINISTRATIVA NO SE PRESENTÓ EVIDENCIA ALGUNA PARA SUSTENTAR DICHAS ALEGACIONES.

C. ERRÓ EL DACO-PONCE AL DETERMINAR ATENDER EL ASUNTO CUANDO CARECÍA DE JURISDICCIÓN Y NO LO DESESTIMÓ PARA QUE EL MISMO FUERA ATENDIDO MEDIANTE ARBITRAJE

Freedom, por su parte, reclamó que el DACo se equivocó al:

[…] ADJUDICAR LA PRESENTE CONTROVERSIA CUANDO ÉSTE CARECE DE JURISDICCIÓN AL EXISTIR UNA CLÁUSULA DE ARBITRAJE EN EL CONTRATO.

[…] DETERMINAR QUE FREEDOM LE DEBÍA UNA OBLIGACIÓN A LA PARTE QUERELLANTE A PESAR DE QUE FREEDOM NO ERA PARTE DEL CONTRATO OTORGADO ENTRE LOS QUERELLANTES Y SUNRUN, Y QUE DACO NO IDENTIFICÓ LA EXISTENCIA DE CONTRATO ALGUNO ENTRE FREEDOM Y LOS QUERELLANTES.

Luego de varios incidentes que no son meritorios mencionar, el 11 de septiembre de este año, los recurridos se expresaron en oposición a la revisión solicitada por ambas peticionarias. Siendo ello así, damos por sometido el asunto y procedemos a resolver.

A.

La competencia de este Tribunal de Apelaciones para revisar las actuaciones administrativas está contemplada en la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), Ley 38-2017, 3 LPRA Sec. 9601, *et seq*. A tales efectos, la Sección 4.1 de la LPAU dispone sobre la revisión judicial aplicable a aquellas órdenes, resoluciones y providencias adjudicativas finales dictadas por agencias, las que serán revisadas por el Tribunal de Apelaciones mediante Recurso de Revisión. 3 LPRA Sec. 9671. Sobre el alcance de esta revisión, la Sección 4.5 de la LPAU establece que las determinaciones de hechos de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente, mientras que las conclusiones de derecho serán revisables en todos sus aspectos.[3]

En nuestro ordenamiento jurídico ha sido la norma general por años que las conclusiones e interpretaciones de las agencias merecen gran consideración y respeto y que su revisión judicial se limita a determinar si estas actuaron arbitraria o ilegalmente. Ahora bien, recientemente nuestro Tribunal Supremo, en consideración del lenguaje específico de la Sección 4.5 de la LPAU, adoptó la normativa establecida en <u>Loper Bright Enterprises v. Raimondo</u>, 603 US 369 (2024). Así pues, concluyó que la interpretación de las leyes es una tarea inherente de los tribunales. En virtud de ello, enunció que, al enfrentarse a un recurso de revisión judicial proveniente de una agencia administrativa, será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos y no guiarse por

---

[3] 3 LPRA Sec. 9675.

la deferencia automática que se aplica a estas decisiones. <u>Vázquez v. Consejo de Titulares</u>, 2025 TSPR 56, 215 DPR _____.

En el citado caso el Tribunal Supremo de Puerto Rico expresó que:

[A]l ejercitar dicho criterio, los tribunales pueden apoyarse, como lo han hecho desde el inicio, en las interpretaciones de las agencias. . . . Sin embargo, tales interpretaciones constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía de conformidad con la APA; y no avalar ciegamente, como se solía hacer en el pasado. *Íd.* (cita depurada).

En ese sentido, nuestro más alto foro enfatizó que "[…] los tribunales deben ejercer un juicio independiente al decidir si una agencia ha actuado dentro del marco de sus facultades estatutarias. Pero principalmente, contrario a la práctica de las pasadas décadas, **los tribunales no tienen que darle deferencia <u>a la interpretación de derecho</u> que haga una agencia simplemente porque la ley es ambigua."** (énfasis en el original)

No obstante, es importante destacar que en el citado caso nuestro más alto foro no modificó la evaluación y respetó las determinaciones de hechos alcanzadas por las agencias. Así pues, prevalece todavía la norma de que, para impugnar la razonabilidad de la determinación administrativa, es necesario que la parte recurrente señale la prueba en el récord que reduzca o menoscabe el peso de la evidencia que obra en el expediente administrativo. <u>Domínguez v. Caguas Expressway Motors</u>, 148 DPR 387, 397-398 (1999) (citando a <u>Hilton Hotels v. Junta Salario Mínimo</u>, 74 DPR 670, 686 (1953)). La misma debe ser suficiente como para que pueda descartarse en derecho la presunción de corrección de la determinación administrativa, no pudiendo descansar en meras alegaciones. <u>Com. Vec. Pro-Mej., Inc. v. JP</u>, 147 DPR 750, 761 (1999). El criterio rector para examinar una decisión administrativa es la razonabilidad de la actuación de la agencia recurrida. <u>González Segarra et al. v. CFSE</u>, 188 DPR 252, 276 (2013).

Por lo tanto, si al momento de examinar un dictamen administrativo se determina que: (1) la decisión administrativa no está basada en evidencia

sustancial; (2) la agencia erró en la aplicación de la ley; (3) el organismo administrativo actuó de manera irrazonable, arbitraria o ilegalmente; o (4) su actuación lesiona derechos constitucionales fundamentales, entonces la deferencia hacia los procedimientos administrativos cede. IFCO Recycling v. Aut. Desp. Sólidos, 184 DPR 712 (2012) (citando a Empresas Ferrer v. A.R.PE., 172 DPR 254, 264 (2007).

*B.*

El contrato es el negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones.[4] En este, las partes pueden acordar cualquier cláusula que no sea contraria a la ley, la moral o al orden público.[5] Los acuerdos establecidos en el contrato tendrán fuerza de ley entre las partes.[6] Estos pactos, se perfeccionan por el mero consentimiento y desde ese momento cada una de las partes está obligada a cumplir con lo expresamente pautado y sus consecuencias. 31 LPRA Sec. 9771; Aponte Valentín v. Pfizer Pharmaceuticals, LLC., 208 DPR 263, 286 (2021).

Para que un contrato sea válido, deben concurrir tres elementos esenciales, a saber: (1) consentimiento de los contratantes; (2) un objeto cierto que sea material del contrato; y la causa de la obligación que se establezca. *Íd.*, a la pág. 284. El consentimiento prestado puede ser nulo cuando ha sido prestado por error, violencia, intimidación o dolo. Bosques vs. Echevarría, 162 DPR 830 (2004). Ahora, es importante conocer que no todo tipo de dolo produce la nulidad del contrato. Así pues, el dolo incidental no invalida el negocio jurídico, pero su autor debe indemnizar el daño causado.[7] Para que el dolo cause la nulidad del contrato, deberá ser

---

[4] Artículo 1230 del Código Civil de Puerto Rico de 2020, 31 LPRA Sec. 9751.
[5] 31 LPRA Sec. 9753.
[6] 31 LPRA Sec. 9751.
[7] 31 LPRA, Sec. 6213.

grave[8] y no puede haber sido empleado por las dos partes contratantes. Bosques v. Echevarría, *supra*.

*C.*

Como regla general, nuestro ordenamiento jurídico permite que las partes en un contrato se obliguen al arbitraje de las posibles controversias relacionadas con su contrato. A tenor con esto, el Artículo 1.04 de la Ley Núm. 147-2024, también conocida como la *Ley de Arbitraje de Puerto Rico* (Ley 147-2024), establece que dos o más partes podrán convenir por escrito para someter a arbitraje cualquier controversia que sea objeto de una acción existente entre ellas o cualquier controversia que pudiese surgir entre las partes suscribientes en el futuro.

En Puerto Rico rige el principio libre de contratación. Por eso, como parte de la voluntad de intención de los contratantes, puede incluirse en los contratos una cláusula se selección de foro con el fin de establecer cuál será el foro donde se atenderán las posibles disputas que puedan surgir de la relación contractual de las partes. Bobe v. UBS Financial Services, 198 DPR 6, 15-16 (2017). Sin embargo, existe una serie de criterios que se considerarán para determinar si las referidas cláusulas son inaplicables en ciertos casos. Dichas cláusulas no aplicarán en las siguientes circunstancias:

1.  El foro seleccionado resulta irrazonable e injusto.

2.  De ventilarse el caso en dicho foro, se incurrirá en una clara y patente inequidad, o sería irrazonable o injusto.

3.  **La cláusula no es válida porque fue negociada mediando fraude o engaño**.

4.  La implantación de dicha cláusula derrotaría la política pública del Estado. (Énfasis suplido)

Es importante destacar que quien se oponga a la aplicación de la cláusula tiene que demostrar que una de estas excepciones le aplica, pues la validez y el cumplimiento de los contratos no puede dejarse al arbitrio de

---

[8] Dolo grave, es "la acción u omisión intencional por la cual una parte o un tercero inducen a otra parte a otorgar un negocio jurídico que de otra manera no hubiera realizado. 31 LPRA Sec. 6211.

uno de los contratantes. *Id.*, a la pág. 16. En cuanto a la presencia de fraude o engaño en la negociación arriba destacada, es igualmente significativo aclarar que dicho reclamo no trata de aquel fraude o engaño relacionado al contrato en general, **sino en la inclusión de la cláusula de selección de foro**. En contrario, quien pretenda dejar sin efecto dicha cláusula tiene que atacar su validez de forma específica y demostrar que esta fue incluida como resultado de fraude o engaño. *Id.*, pág. 18.

*D.*

La Ley 5 del 23 de abril de 1973, mejor conocida como la Ley Orgánica del Departamento de Asuntos del Consumidor (Ley Núm. 5) creó al DACo. La creación de dicho organismo administrativo respondió a la necesidad de establecer un cuerpo efectivo capaz de "sacar al consumidor del estado de indefensión y desvalimiento en el cual se encuentra."[9] Así pues, el Artículo 3 del mencionado estatuto establece como primordial propósito del DACo, entre otros, el vindicar e implementar los derechos del consumidor. En lo concerniente, y conforme designa el Artículo 5-A de la Ley Núm. 5, al DACo se transfirió lo referente a la Oficina de Energía de Puerto Rico. Esto incluyó, entre otras cosas y sin ser una limitación: todos los poderes, deberes, funciones, facultades, puestos, propiedades, equipo, expedientes y documentos; fondos disponibles y sobrantes; cualquier reglamento que rigiera la operación de la oficina transferida.[10]

Además de los poderes y deberes antes listados, la Ley Núm. 5 le reconoce al DACo y su Secretario la autoridad de entre otras cosas:

a. Reglamentar, fijar, controlar, congelar y revisar los precios, márgenes de ganancias y las tasas de rendimiento sobre capitales invertidos a todos los niveles de mercadeo, sobre los artículos, productos y aquellos servicios que corriente y tradicionalmente se prestan y se cobran por horas o por unidad, se ofrezcan o se vendan en Puerto Rico;
b. Atender consultas y ofrecer asesoramiento técnico y, además, prestar ayuda legal a los consumidores en casos meritorios.

---

[9] Véase Expósición de Mótivos de la Ley Núm. 5.
[10] 3 LPRA sec. 341d-1

    c. Atender, investigar y resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía.

    d. Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación administrativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a Derecho.

    e. Establecer las reglas y normas necesarias para la conducción de los procedimientos administrativos, tanto de reglamentación como de adjudicación, que celebre el Departamento.

    f. …

    h. Emitir órdenes (subpoena) para compeler la comparecencia de testigos y la producción de documentos y/o información.

    … .[11]

Toda vez que el Negociado de Energía de Puerto Rico como el DACo ostentan jurisdicción sobre controversias relacionadas a los sistemas de placas solares, el 9 de febrero de 2022, el DACo emitió la Interpretación 2022-003 para aclarar aspectos jurisdiccionales del foro adjudicativo del DACo respecto a los comercios que ofrecen servicios de venta, instalación y/o mantenimiento de sistemas de placas solares.[12] El mencionado documento indica que el DACo cuenta con jurisdicción para atender querellas relacionadas a servicios de paneles o placas solares, siempre que tales reclamaciones no contengan alegaciones que giren en torno a jurisdicción primaria del Negociado.

Específicamente, al citar varias decisiones de este Tribunal de Apelaciones, expone que el DACo tiene jurisdicción para atender: controversias relacionadas a los servicios en garantía; alegaciones por incumplimiento contractual, por productos defectuosos; sean estos las placas solares o las baterías; cualquier controversia contractual relacionada a la adquisición de un producto, sean placas o baterías, la instalación de dicho producto y los servicios prestados en relación a los mismos.

---

[11] 3 LPRA sec. 341e

[12] Esta interpretación se emitió conforme la autoridad que la Ley Núm. 5 le reconoce al Secretario. Véase:
https://www.daco.pr.gov/wp-content/uploads/2023/01/Interpretacion-2022-003.pdf

La Interpretación 2022-003 contiene un apartado en el cual discute las cláusulas de arbitraje. Así, en su acápite III, resume la norma jurídica vigente relativa a las circunstancias que hacen inaplicable una cláusula de arbitraje. De igual forma, incorpora estos criterios a la realidad de las querellas que de modo rutinario se radican ante el DACo.

En lo pertinente, y basándose en el derecho allí discutido, en la Interpretación 022-003 el entonces Secretario del DACo concluyó que en los casos en los que esté de por medio una cláusula de arbitraje, la misma no sería automáticamente exigible. Esto, pues si bien existe una política pública a favor del arbitraje, ha sido resuelto que, en ciertos escenarios, la misma podría ser invalidada de configurarse las circunstancias que así lo permiten. En virtud de ello, el Secretario del DACo enunció que antes de ceder o paralizar su jurisdicción, la agencia debía analizar si la cláusula en cuestión era válida o si se configuraban los criterios que la jurisprudencia vigente dispone para decretar su nulidad.

-III-

Dentro de los errores señalados ante nos, ambas peticionarias reclaman que el DACo carecía de jurisdicción para atender la *Querella*. Planteándose la falta de jurisdicción por parte del DACo sobre el asunto, nos vemos obligados a resolver en primer lugar esta controversia. Al final de cuentas, si resolviéramos que el DACo actuó sin jurisdicción, sería innecesario atender el restante de los señalamientos de error.

El reclamo de falta de jurisdicción levantado ante nos, descansa en que el contrato suscrito por los recurridos para la adquisición del sistema de placas solares contiene una cláusula de arbitraje en la que las partes acordaron que cualquier controversia sobre el contrato sería sometida a tal procedimiento para su resolución. Basándose en tal hecho, demandan que el DACo debió desestimar el caso equivocándose al atenderlo.

A tales efectos, en el recurso TA2025RA00150, Sunrun arguye que el derecho sobre los contratos en nuestro ordenamiento jurídico es claro en cuanto a que las partes están obligadas por los pactos acordados. Así, señala que en el presente caso el contrato firmado por los recurridos establece una cláusula de arbitraje clara. Denuncia pues, que la mencionada cláusula indica que cualquier controversia sobre el contrato debe ser sometida al proceso de arbitraje, por lo que el DACo carece de jurisdicción.

Freedom Forever, por su parte, dentro del recurso TA2025RA00156, afirma que en virtud del derecho vigente y la jurisprudencia aplicable que cita, la cláusula de arbitraje clara e inequívoca contenida en el contrato de autos debe respetarse. También, añade que conforme la doctrina de separabilidad, la validez de un contrato cuya cláusula de arbitraje se cuestiona debe ser llevado ante la consideración de un árbitro.

En contra de estos argumentos, los recurridos afirman que su consentimiento contractual fue viciado por la conducta dolosa en la contratación del sistema. Concretamente, exponen que la ocultación de la cláusula de arbitraje en tal etapa constituye dolo por omisión. Añaden que la falta de divulgación vició su consentimiento por lo que el DACo correctamente lo declaró nulo, invalidándose todos los acuerdos allí contenidos.

Evaluados los argumentos levantados por las entidades peticionarias, así como aquellos sometidos por los recurridos en oposición y luego de examinar la transcripción de la audiencia administrativa celebrada en el caso, no encontramos que el reclamo de falta de jurisdicción levantado por Sunrun y Forever Freedom como parte de los errores señalados en sus respectivos recursos sea correcto.

En el presente caso no existe controversia sobre el hecho de que el contrato suscrito entre las partes contiene una cláusula de arbitraje. Es también incontrovertido el hecho de que, mediante esta, las partes pactaron

dilucidar cualquier tipo de controversia a través de este procedimiento. Ahora, la prueba desfilada ante el DACo **y creída por la juzgadora de hechos** ciertamente levanta sospechas sobre la validez del consentimiento brindado por los recurridos al contratar y, por consiguiente, del documento en cuestión.

Durante la audiencia celebrada ante el DACo, ambos peticionarios prestaron testimonio sobre su reclamación. En cuanto a la intervención del vendedor y las circunstancias que rodearon la firma del contrato, la señora Alvarado testificó lo siguiente:

> R: Okey. Se personó a mi casa –con referencia de, pues, de un familiar– un vendedor, pues, ofreciéndonos el sistema solar. Entendíamos que realmente, por la situación de salud de mi esposo y la mía... entonces, el vendedor se llama Chris Royal [fonética]. Nos ofreció el sistema, nosotros aceptamos. **Se firmaron unos papeles inmediatamente, porque eso fue algo rápido en la computadora. Nunca recibimos el contrato.** *El contrato lo recibimos en agosto 15 a petición mía.* **Nunca llegó, nunca llegó,** porque cuando empezamos a tener problemas con el sistema pues, yo dije: "Mire, yo no tengo ningún contrato nunca, ni eso nos llegó".
>
> P: Okey. Y ese, ese contrato, ¿con quién, si alguien, con qué compañía, si alguna, usted lo suministró?
>
> R: Con Freedom Forever.
>
> P: Okey. Usted dice que... ¿Para qué fecha le envían ese contrato?
>
> R: **El 15 de agosto.**[13]
>
> […]
>
> P: Okey. Le pregunto, y usted mencionó que, verdad, le dijo al Tribunal horita que dicho contrato era en inglés.
>
> R: Unjú.
>
> P: ¿A qué usted se refirió con eso?
>
> **R: Sí. Bueno, porque yo, yo no hablo inglés.**
>
> **P: Okey.**
>
> **R: Yo no hablo inglés. No entiendo inglés.** Yo soy la que leo todo, entonces me llegó... cuando me llegó ese contrato que yo lo solicité, es grueso, no sé cuántas páginas. Son como aproximadamente 60 páginas. Cuando me llegan, pues, yo voy buscando, traduciendo palabras, lo que yo entendía que era lo que... para entender qué era lo que ellos pues, estaban escribiendo en el... o sea, lo que estaba plasmado en el contrato.

---

[13] Transcripción de Vista del 21 de marzo de 2025, página 12, línea 24 a la pág. 13, línea 12.

P: Ahora le pregunto, ya que yo no estuve allí ese día, ese documento de aproximadamente 60 páginas que usted dice que le envían, ¿qué relación, si alguna, tiene con el contrato que usted hizo cuando fue el vendedor?

R: **Bueno, realmente, en el contrato que nos dio el vendedor él lo que nos trajo fue a una, una pantalla, una, una, una *d'esto*, una computadora. Y él lo que nos dijo fue: "Firmen aquí, firmen aquí, firmen aquí". Eso fue rápido.** Pues, yo esperando que... como yo entiendo que ellos me van a enviar el contrato, yo: "Ahí yo puedo leer, chequear", porque tengo unos días para, para verificar. Pero ese contrato nunca llegó.

P: Okey. ¿Y qué similitud, si alguna, tiene lo que usted firmó en el acta con el contrato de las 60 páginas que le llegó?

R: **Realmente no podría decir qué es la similitud, porque él lo único que nos dio fueron unas áreas nada más para firmar. No nos mostró todo el contrato.** O sea, que no puedo decir que fue esta parte, porque él nos dijo: "Firmen aquí, estas áreas", o sea, lo que tienden a... que era una, un, una, una *tablet.*

P: ¿Una *tablet?* Okey.

R: Exacto. Esa es la palabra, para firmar. O sea, que él no nos explicó detalladamente el contrato. O sea: "Esto es así". **Él iba como con prisa para que firmáramos y, pues, nosotros firmamos**, porque entendíamos que lo que nosotros necesitábamos... yo digo: "Bueno, si es el sistema de paneles solares, nosotros lo necesitamos. Pues, vamos a firmar".[14]

Basándose en tan claras manifestaciones, el DACo determinó que el vendedor no fue claro en la divulgación de datos relevantes al no explicarles la cláusula de arbitraje, no mostrarles el contrato firmado y nunca darles una copia a los querellantes, sino hasta después a solicitud de los recurridos. Al descansar en dichas determinaciones, encontró que Sunrun y Freedom Forever, actuaron de forma engañosa **en el manejo previo a la perfección del contrato,** ocultándole a los recurridos el contenido completo del acuerdo, particularmente sobre la inclusión de una cláusula de arbitraje en el mismo. Frente a esto, resolvió que la cláusula de arbitraje en la que descansó el reclamo de ausencia de jurisdicción era inválida e inaplicable por lo que sí tenía jurisdicción sobre la controversia.

Tal cual arriba citamos, en <u>Bobé v. USB Fin. Services</u>, *supra,* nuestro Tribunal Supremo reconoció que existen unos criterios a evaluar al determinarse si una cláusula de selección de foro aplica o no. Entre las

---

[14] *Id.*, pág. 27, línea 22 a la pág. 29, línea 23.

circunstancias que designó una cláusula de arbitraje no aplicaría, incluyó, **cuando esta fue negociada mediante fraude o engaño.** Así pues, como antes mencionamos, estableció que la alegación de fraude que invalida una cláusula de selección de foro no trata de aquel fraude o engaño relacionado al contrato en general, sino en la inclusión de la cláusula de selección de foro. Específicamente, enunció que "*la parte que pretende dejar sin efecto la cláusula de selección de foro tiene que atacar su validez de forma específica, demostrando que ésta fue incluida en el contrato como resultado de fraude o engaño.*" *Id.*, págs. 18-19. (Énfasis en el original) Con estas expresiones como guías, evaluamos las circunstancias del caso de autos.

Tal cual se desprende de las porciones del testimonio de la señora Alvarado arriba reproducidas, creídas por el DACo, **el vendedor del sistema solar no le proveyó ni antes, ni al momento de la firma del acuerdo, copia completa del documento en cuestión.**[15] **Tampoco le orientó sobre su contenido, particularmente sobre la existencia de una cláusula de arbitraje, limitándose a señalar en un dispositivo electrónico (*tablet*) dónde debían firmar**. Por el contrario, al momento de la contratación- proceso que describió como rápido- el vendedor se limitó a señalar donde tenía que consignarse la firma. Estas manifestaciones fueron confirmadas por la declaración del señor Rosario, quien al testificar manifestó que, al momento de la venta, **el vendedor lo único que le enseñó fue la página donde tenía que firmarse**. También señaló que, en ese momento, <u>solamente</u> se le explicó cuántas placas tendría el sistema, la función de la batería que incluía el sistema ante la suspensión del servicio eléctrico por parte de LUMA, y la cantidad que pagarían.[16]

---

[15] Nos parece adecuado destacar que estas no son las únicas instancias en la que la señora Alvarado declaró sobre la falta de orientación por parte del vendedor sobre el contenido del contrato. Véase, por ejemplo, *Transcripción de Vista*, pág. 60, línea 23 a la pág. 61, línea14. Tampoco constituyen los únicos momentos en los que esta manifestó no haber recibido copia del contrato de 60 páginas sino hasta luego de haberlo firmado e inclusive, haberse instalado las placas solares. *Id.,* pág. 62, líneas 12-24 y pág. 63, línea 18 a la pág. 64, línea 5.
[16] *Id.*, 69, líneas 19-23; pág. 70, líneas 1-8; pág. 70, línea 16 a la pág. 71, línea 4.

De ambos testimonios se desprende que, al momento de prestar consentimiento, el vendedor, Chris Royal, no le explicó a los recurridos el contenido del contrato, no les informó que el documento que estaban firmando contenía una cláusula de arbitraje y mucho menos les educó sobre las implicaciones de dicha estipulación. Inclusive, es esencial considerar que el contrato en el que se incluyó la cláusula de arbitraje en controversia está redactado en un idioma que, tal cual declararon, ninguno de los recurridos domina.

Sunrun no procuró asegurarse de que los recurridos entendieran cabalmente los acuerdos a suscribirse brindándoles una explicación educada del contenido del acuerdo a firmarse. Por el contrario, y luego de haberles prometido que el sistema solar resolvería sus necesidades, de forma apresurada les señaló a las partes que había que firmar. Indudablemente, al así actuar, obtuvo un consentimiento bajo engaño, al convenientemente esconder sus cláusulas. Recordemos que el contrato en cuestión no es un acuerdo negociado activamente por las partes, sino uno de adhesión preparado exclusivamente por Sunrun. Por consiguiente, y conforme la *Interpretación 2022-003, supra,* sus efectos deben ser ponderados en detalle y cualquier duda, se interpretará a favor de la parte débil en la contratación.

Además de haber callado sobre las cláusulas y condiciones del acuerdo, a los recurridos tampoco se les proveyó oportunamente una copia física del contrato. Más bien, y sólo a insistencia de la señora Alvarado, <u>a destiempo</u> produjo el contrato, **cuando el sistema de placas ya había sido instalado**. Es claro pues, que la inclusión en el caso de la cláusula de arbitraje mediante la cual los recurridos renunciaban a su derecho a recurrir al DACo y, en su lugar, se sometían al arbitraje fue hecha mediante engaño. Solo basta con notar que, durante su testimonio, el señor Rosario testificó que, a su entender, el proceso que se estaba llevando a cabo ante el DACo,

constituía un arbitraje para ver que estos nunca entendieron a qué proceso de solución de conflicto se habían sometido.[17]

No nos cabe duda de que la decisión del DACo en el presente caso de invalidar la cláusula de arbitraje respondió a la presencia de fraude y engaño por parte de ambas peticionarias en su inclusión. Ante las declaraciones aludidas, igual de convencidos estamos de que esta determinación encuentra apoyo en la prueba desfilada durante la audiencia administrativa. Al final de cuenta, la credibilidad que las declaraciones de los recurridos le merecieron al juzgador de los hechos para alcanzar esta conclusión, no fue impugnada. Al ser así, como foro apelativo, no debemos intervenir.

Por lo tanto, habiéndose demostrado el engaño en la inclusión de la cláusula de arbitraje al momento de brindar consentimiento, la aplicación del derecho efectuada por el DACo es correcta. Estimamos que el organismo administrativo actuó conforme a derecho y de forma razonable al declarar inválida la selección de foro. Por consiguiente, su decisión merece nuestra deferencia.

Dicho esto, procedemos a atender el restante de los señalamientos de error traídos ante nuestra atención. Con este fin, tenemos primero la encomienda de determinar si en efecto no procedía declarar Ha Lugar la Querella y fue un error resolver que hubo dolo, maquinaciones insidiosas, fraude y prácticas y anuncios engañosos. Así propone Sunrun en los dos primeros errores del recurso TA2025RA00150.

Específicamente, con el fin de derrotar la decisión recurrida, Sunrun argumenta que el expediente administrativo carece alegaciones específicas de fraude y prácticas engañosas y que durante la audiencia administrativa no se desfiló prueba que sustente la conclusión del DACo en cuanto a estas.

---

[17] *Id.,* pág. 69. Líneas 19-23; pág. 70, línea 16 a la pág. 71, línea 5; pág. 74, línea 22 a la pág. 75. Línea 13.

A modo de impugnación de la prueba, meramente expone que debió haberse interrogado al vendedor de Freedom Forever para descubrir cuál fue su intención al momento de venderle el sistema solar a los recurridos, cosa que no se hizo. De igual forma, se limita a afirmar que lo que sí quedó evidenciado fue que los recurridos no leyeron el contrato de financiamiento; que contrario a lo que estos adujeron, sí recibieron el acuerdo; que, pese a no entender el idioma del documento, no solicitaron el mismo en Español y peor aún, lo firmaron sin entenderlo.[18]

Si bien reconoce que la presencia de dolo puede producir la nulidad de un contrato, reclama que solamente el dolo grave acarrea dicha consecuencia. De igual forma, aduce que, en nuestro ordenamiento jurídico, quien alega dolo tiene la obligación de probarlo y niega que así lo hayan hecho los recurridos. Así pues, afirmativamente expone que para determinar si medió dolo que anule el consentimiento debe considerarse las circunstancias del perjudicado, entre estas, su preparación académica. Acto seguido, expone que los recurridos denotaron ser personas que saben leer, escribir, expresarse y defenderse verbalmente, además de presumirse que son personas prudentes y razonables.

A su vez, si bien reconoce que el callar sobre un aspecto importante ante objeto del contrato es un acto doloso y constituye mala fe, refuta que:

> "[e]n el caso de autos, no existe controversia en cuanto a bajo qué circunstancias el querellante aceptó la firma del contrato de financiamiento de Sunrun que le ofreció el vendedor de Freedom Forever, Chris Royal, a través de la Tablet que le enseñó y que, durante la Vista Administrativa, admitió que observó el contrato. **El querellante aceptó haber recibido dicho contrato por correo electrónico con posterioridad (ya que debía contar con la firma del representante de Sunrun) y, según el audio presentado durante la vista, el querellante aceptó todas las condiciones para que le instalaran en su residencia el sistema solar fotovoltaico ofrecido.** Si el querellante no leyó el contrato, no lo entendió en su totalidad o no solicitó cualquier documento adicional para informarse **previo a que le instalaran el servicio**, ahora no puede utilizar el mecanismo de que "confiaba o que desconocía" como subterfugio para no enfrentar su responsabilidad como

---

[18] La prueba recibida por el DACo se explica por sí sola. Esta demostró más de lo que Sunrun alega. Basta de referencia nuestra discusión sobre el planteamiento de falta de jurisdicción de ambas peticionarias y la falta de transparencia de su parte para con los recurridos.

consumidor y enfrentar su obligación ante el contrato firmado y que él aceptó.

El testimonio brindado por los recurridos ante el DACo, según recogido en la Transcripción de la Vista Administrativa habla por sí solo. Conforme el mismo, quedó establecido que:

a. Al momento de firmarse el contrato, el Sr. Chris Royal, les mostró **de forma rápida** dónde tenían que firmar en el dispositivo electrónico *(Tablet)*, **sin mostrarles el documento completo o si quiera explicar su contenido,** particularmente sobre la cláusula de arbitraje allí contenida, y limitándose a indicar que con posterioridad se les haría llegar copia de este.[19]

b. El vendedor les representó en todo momento que el sistema de placas solares adquirido funcionaría siempre cuando la propiedad no recibiera energía de LUMA.[20]

c. Fue precisamente la garantía de tener luz eléctrica cuando LUMA esté fuera de servicio la que, según los recurridos, les motivó a adquirir el sistema vendido e instalado por Sunrun y Freedom Forever.[21]

d. El sistema nunca funcionó.[22]

e. Copia escrita del contrato no le fue provista a los recurridos al momento de la firma, la que ocurrió en marzo de 2024. No fue meses después, específicamente el 15 de agosto de 2024, que se produjo copia del mismo a insistencias de la señora Alvarado, cuando ya el sistema solar había sido instalado el 10 de junio del mismo año.[23]

Contrario a lo planteado por Sunrun, el expediente administrativo contiene prueba clara y contundente de que el vendedor de Sunrun y Freedom Forever, bajo la promesa de que los recurridos podrían energizar su residencia en todo momento- aun cuando LUMA no funcionara-, de forma apresurada, logró que estos firmaran un acuerdo de compra, financiamiento e instalación de un sistema de placas solares. Ciertamente, y según fueron creídos por el DACo, estos hechos demuestran una estrategia de venta apresurada en la cual, aprovechándose de la necesidad de los recurridos de contar con un servicio eléctrico estable, se hicieron

---

[19] Véase porciones del testimonio de la señora Alvarado más arriba transcritas. Véase, además, Transcripción de Vista, pág. 29, líneas 16-23.

[20] *Id.*, pág. 13, líneas 13-23; pág. 14, líneas 10-15; pág. 23, líneas 8-27; pág. 25, línea 16 a la pág. 26, línea 10; pág. 33, línea 13-23.

[21] *Id*, pág. 25, línea 16 a la pág. 26, línea 10; pág. 31, línea 25 a la pág. 32, línea 15.

[22] *Id.*, pág. 22, líneas 15-22; pág. 25, líneas 11-25; pág. 34, líneas 17-24.

[23] Véase, pág. 14, líneas 12-25; pág. 12, líneas 17-19.

promesas y compromisos sobre el objeto principal del negocio que no fueron cumplidas. También denotan la ocultación al momento de brindarse el consentimiento de términos y condiciones medulares. Probadas tales vicisitudes, más allá de inconcebibles, nos parece que los argumentos levantados por Sunrun para derrotarlas no cumplen con el rigor que nuestro ordenamiento jurídico exige para derrotar las determinaciones de hechos alcanzadas por el DACo, por lo que merecen nuestro respeto.

Igual acatamiento exhibiremos en cuanto a la determinación del DACo de encontrar a Freedom Forever y a Sunrun igualmente responsable ante los recurridos, que la primera impugna en el recurso TA2025RA00156. En contra de esta decisión, Freedom Forever expone que no suscribió el contrato en controversia y que, de hecho, el acuerdo ni siquiera le menciona. Específicamente, adujo que ni del récord administrativo, ni del propio Contrato, se desprende la existencia de relación alguna entre el Sr. Chris Royal y Freedom, y mucho menos quedó establecido que este fungió en carácter de representante de Freedom al momento de venderle el sistema de placas solares a la Parte Querellante. Es más, añade que el DACo no identificó un nexo separado e independiente mediante el cual Freedom quede obligado directamente con los recurridos.

Examinado el legajo apelativo, no quedamos del todo convencidos. La mera ausencia de una referencia directa de Freedom Forever en el contrato en controversia, no necesariamente la releva frente a los recurridos. Menos cuando una lectura del contrato nos permite identificar que las cláusulas del acuerdo podrían beneficiarle. [24]

---

[24] Por ejemplo, en la pág. 21 del contrato se incluye una disposición que lee: *By signing this agreement, you waive your right to bring a class action lawsuit against Sunrun **and our partners***. Asimismo, la pág. 24 contiene el siguiente lenguaje en cuanto a indemnización: *To the fullest extent permitted by applicable law, you agree to indemnify, advance expenses, and hold harmless Sunrun and our Related Parties (defined above) from any and all claims, actions, costs, expenses (including reasonable attorneys' fees and expenses), damages, liabilities, penalties, losses, obligations, injuries, demands, and liens of any kind or nature in connection with, arising out of, or in any way related to your breach of this Agreement, your negligence or willful misconduct, or your violation of law. […]*.

De igual forma, amerita destacar que, durante la vista administrativa, la señora Alvarado identificó al Sr. Chris Royal como vendedor de Sunrun **y de Freedom**.[25] Esta, además, declaró que todas las gestiones han sido con Freedom Forever, quien inclusive envió a sus técnicos en varias ocasiones a la residencia de los recurridos para dar servicio y verificar la instalación.[26] Asimismo, y conforme propiamente declaró el Sr. Héctor Pérez Pagán, Gerente de su oficina en San Juan, Freedom Forever fue quien instaló el sistema.[27] Vemos entonces, que el expediente administrativo sí contiene evidencia que justifica la concesión de un remedio a favor de los recurridos por parte de Freedom Forever. Al final de cuentas, estos instalaron el sistema de placas solares.

Habida cuenta de todo lo aquí consignado, resolvemos que la decisión administrativa impugnada por Sunrun en el recurso TA2025RA00150 y por Freedom Forever en el TA2025RA00156 es una razonable, que encuentra apoyo en el expediente administrativo. La misma, además, es correcta en derecho, por lo que debe sostenerse. En conclusión, ninguno de los errores planteados en los recursos consolidados de epígrafe fue cometido.

IV.

Por todos los fundamentos antes expuestos, confirmamos la *Resolución* emitida por DACo

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[25] Tampoco pasa por desapercibido algunas expresiones levantadas por Sunrun en su recurso de revisión TA2025RA00150. Para ilustrar, en la página 7 de su escrito, al mencionar al Sr. Chris Royal, entre corchetes se refiere a él como vendedor del sistema de placas solares de Freedom Forever. Más adelante, en la misma página, Sunrun niega tener vendedores o instaladores en todo Puerto Rico. Las inconsistencias levantadas por ambas peticionarias, como mínimo, son suficientes para inspirar recelo ante el reclamo que levantan para evadir responder ante los recurridos.

[26] Para ejemplos, véase Transcripción de Vista, pág. 15, líneas 5-12; pág. 17, línea 11 a pág. 18, línea 25; pág. 19, línea 21 a la pág. 20, línea 2; pág. 44, líneas 2-23.

[27] *Id.*, pág. 84, líneas 8-17.